CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS

STATE OF LOUISIANA

NO. 13-9845

DIV. 4

SECTION 16

CHARLES MATTHEWS, individually; CHARLES MATTHEWS on behalf of his membership, ownership or equity interest in the following: WJLT, L.L.C., Camillus Specialty Hospital, L.L.C., f/d/b/a Crescent City Hospital; Lazarus Healthcare, L.L.C.; Louisiana Specialty Hospital, L.L.C. f/d/b/a Jefferson Extended Care; New Orleans Rehabilitation Hospital in Luling and his wife SHERITA MATTHEWS

VERSUS

JACK STOLIER, STEPHEN M. SULLIVAN; SULLIVAN STOLIER, A PARTNERSHIP; SULLIVAN STOLIER AND RESOR, A PROF LAW. CORP, SULLIVAN STOLIER KNIGHT, L.C.; d/b/a THE HEALTH LAW CENTER; MICHAEL SCHULZE; RED RIVER HEALTHCARE MANAGEMENT COMPANY, L.L.C.; JAMES MORGAN, CONNIE MORGAN; JEFFERSON LTAC, L.L.C. ("JLTAC"); CNA INSURANCE COMPANY; XYZ INSURANCE COMPANY

FILED: _____

_____
DEPUTY CLERK

**ORIGINAL PETITION**

NOW COMES, Plaintiff, Charles Matthews, a person of the age of majority, domiciliary and resident of the State of Louisiana, individually, and his wife, Sherita Matthews, and Charles Matthews on behalf of Charles Matthews' personal, direct or indirect membership/ownership interest in the following entities :

WJLT, L.L.C. d/b/a Jefferson Extended Care
Camillus Specialty Hospital, L.L.C. ("CSH") formerly d/b/a Crescent City Specialty Hospital
Lazarus Healthcare, L.L.C. ("Lazarus")
Louisiana Specialty Hospital, L.L.C. ("LSH")
Saint Charles Rehabilitation Hospital, L.L.C d/b/a Luling Rehabilitation Hospital ("Luling")

Hereinafter who are referred to globally by name as plaintiffs and who file the following Original Petition herein.

1)

PARTY DEFENDANTS

The following persons and entities are made defendants herein, and shall be liable jointly, severally and/or solidarily as allowed by law, as set forth below:

A.   STEVE SULLIVAN, A Louisiana attorney, individually, a person of the full age of

1





majority, domiciliary and resident of the State of Louisiana.

B.     MICHAEL SCHULZE, A Louisiana attorney, individually, person of the full age of

majority, domiciliary and resident of the State of Louisiana and employee of Sullivan

Stolier Knight.

C.     SULLIVAN STOLIER AND RESOR, a professional law corporation, whose

principal place of business is in Orleans Parish.

D.     SULLIVAN AND STOLIER, a partnership, whose principal place of business is in

Orleans Parish.

E.     SULLIVAN, STOLIER, KNIGHT, L.C., a Louisiana law firm, operating as a

company domiciled Lafayette whose principal place of business is in Orleans Parish.

F.     JACK STOLIER a Louisiana attorney, individually, person of the full age of

majority, domiciliary and resident of the Parish of Orleans, State of Louisiana and

employee of Sullivan Stolier Knight.

G.     JAMES MORGAN, individually, person of the full age of majority, domiciliary and

resident of the State of Louisiana as owner, administrator, manager of Red River

Healthcare Management Company, LLC. ("Red River"). Morgan is being sued

individually, and as owner, employee of Red River.

H.     CONNIE MORGAN,  individually, person of the full age of majority, domiciliary

and resident of the State of Louisiana owner and employee of Red River Healthcare

Management Company, LLC..

I.     RED RIVER HEALTHCARE MANAGEMENT COMPANY, L.L.C. a company

domiciled and authorized to do business in Louisiana and engaged in the business of

managing health care companies such as long term acute care hospitals.

J.     JAMES FRITSCHEN, person of the full age of majority and resident of Louisiana

who is being sued individually.

K.     CNA INSURANCE COMPANY, an insurance company which on  information and

belief,  insures the following persons:

    Sullivan Stolier and Knight Law firm

    Steve Sullivan

    Michael Shultz

Through the broker, Gilsbar, in a policy of insurance covering the law firm, its partners and employees for negligent actions with respect to the handling of a client matter.

CNA is being sued pursuant to the Louisiana Direct Action Statute, LSA R.S. 22:655 and former R.S. 22:1269 re-designated as R.S. 22:443 by Acts 2008, No. 415, §1, eff. Jan. 1, 2009.

J. XYZ INSURANCE COMPANY, ("XYZ") an insurer whose name shall be supplied after it is obtained through discovery. XYZ is being sued as the insurer for Morgan, Morgan, and Red River, under either a errors and omissions policy or a professional negligence policy pursuant to the Louisiana Direct Action Statute, LSA R.S. 22:655 and former R.S. 22:1269 re-designated as R.S. 22:443 by Acts 2008, No. 415, §1, eff. Jan. 1, 2009.

2)

## PLAINTIFFS FURTHER DEFINED

The following parties are the Plaintiffs,

A. Plaintiff Charles Matthews is an individual, resident of Lafayette Parish, and domiciliary of Louisiana who has been in the business of managing, owning and operating private rehabilitation, and long term acute care hospitals for nearly twenty years. He currently owns and manages PediaKare, a facility for caring for children who have specialized medical needs and disabilities. He has previously owned and been the daily operations manager of several rehabilitation hospitals and LTACS. Sherita Matthews is his wife and shares a community property estate with him and is also named plaintiff herein.

B. Camillus Specialty Hospital, L.L.C., is a Louisiana limited liability company formerly operating as a 40 bed private long term acute care ("LTAC") hospital, d/b/a Crescent City Specialty Hospital ("Camillus" when referring to the LLC and "Crescent City" when referring to the hospital). CSH ceased operations on or about October 21, 2012. Crescent City was a 40 bed facility which receives patients requiring critical care, which patients are entirely funded by Medicare. The holding entity, CSH is the subject of an ownership dispute still pending between Charles Matthews ("Matthews") and Daniel J. Daigle ("Daigle") and Daigle's company CCSH Creditor Protection

3

Corporation ("CCSH Cred.Corp."). C. Lazarus Health Care L.L.C., ("Lazarus") is a limited liability company organized under the State of Louisiana, and owned 100 percent by Charles Matthews.

C. WJLT Hospital, L.L.C. ("WJLT")   is a Louisiana Limited Liability Company organized under the State of Louisiana. WJLT is owned 100 percent by Plaintiff Mathews. WJLT owns and until November 30, 2012 operated  a long term acute care hospital presently  leasing space on the Seventh Floor of  West Jefferson Medical Center in Gretna Louisiana, with office space on the fifth floor.  WJLT purchased the assets and 100 percent membership interest in the West Jefferson LTAC from Kindred Medical Care ("Kindred") together with the hospital license and Medicare Provider Number from Kindred on October 18, 2012.

D. Louisiana Specialty Hospital, L.L.C.  F/d/b/a/ Jefferson Extended Care ("LSH") is a Louisiana Liability Company formerly owned by Kindred, and purchased by Matthews, through his company WJLT, on October 18, 2012. Matthews acquired 100 percent of the ownership of LSH.

3)

Plaintiffs assert that based on the facts pled herein the Defendants acted in concert together, creating joint, several and in solido liability.

4)

VENUE

Venue is proper in this court under La. Code of Civil Procedure Article 77 in so far as the law firm Sullivan Stolier and Knight is domiciled within the State of Louisiana in Orleans Parish and has its principal place of business located at 909 Poydras Street, New Orleans, Louisiana.

GENERAL ALLEGATIONS

LONG TERM ACUTE CARE HOSPITALS EXPLAINED

5)

This matter involves the negligent and improper actions by Matthews' own lawyers, sounding in breach of fiduciary duty and fraud of Matthews's ownership in an LTAC hospital which their client Matthews owned in Jefferson Parish, having acquired same from Kindred in October of 2012.

6)

4

An LTAC hospital facility treats medically complex patients, including the critically ill. The LTAC is designed to simultaneously deliver comprehensive and coordinated medical interventions directed at all affected organ systems, while maintaining a patient-centered, integrated care plan. A length of stay for patients in an LTAC can be a month or more. The overwhelming majority of hospital patients are over 65 years old. They require a high level of monitoring and specialized care, yet may not need the services of a traditional intensive care unit. Due to their severe medical conditions, these patients are not clinically appropriate for admission to other post-acute settings and their medical conditions are periodically or chronically unstable. LTAC hospitals require interdisciplinary teams, including physician specialists. Where appropriate, the treatment programs may involve the services of several disciplines, such as pulmonary medicine, infectious disease and physical medicine. Substantially all of the acute and medically complex patients admitted to hospitals are transferred by other healthcare providers such as general short-term acute care hospitals, intensive care units, managed care programs, physicians, nursing centers and home care settings.

7)

Virtually all of Crescent City' patients are Medicare or Medicaid patients. The Medicaid program is designed to provide medical assistance to individuals unable to afford care. Medicaid payments are made under a number of different systems, which include cost-based reimbursement, prospective payment systems or programs that negotiate payment levels with individual hospitals. Medicaid programs are subject to statutory and regulatory changes, administrative rulings, interpretations of policy by state agencies and certain government funding limitations, all of which may increase or decrease the level of payments to our hospitals.

8)

The Long-Term Acute Care Prospective Payment System ("LTAC PPS") maintains LTAC hospitals as a distinct provider type, separate from short-term acute care hospitals. Only providers certified as LTAC hospitals may be paid under this system. To maintain certification under LTAC PPS, the average length of stay of fee for service Medicare patients must be at least 25 days.

9)

In 2011 Crescent City LTAC was being operated at Commerce Street, Gretna, Louisiana within a building owned by Commerce Street Gretna, L.L.C. The hospital was sold to Oceans

5

Specialty Group ("Oceans") and it continued to lease space from Commerce Street, Gretna LLC. In 2011, Oceans sold the membership interests (including all assets and liabilities) of Crescent City to MDA, L.L.C. and plaintiff Sherita Matthews. MDA was majority owner and plaintiff Sherita Matthews was a minority owner of 45 percent. MDA, L.L.C. is owned 100 percent by Daniel Daigle ("Daigle"). Daigle managed the financials and was the only signatory on accounts, and plaintiff Charles Matthews managed daily operations.    In November 2011, Matthews started another separate business, PediaKare in Lafayette.    In March of 2012 Daigle, through a series of machinations took control of CSH and Crescent city, squeezing out Sherita Matthews and the manager plaintiff, Charles Matthews. Daigle then installed his full-time employee, Defendant James Fritschen ("Fritschen") as manager of CSH and Crescent City.

10)

However by July 31, 2012, Daigle who managed and owned Crescent City ceased accepting patients. He intended to sell the hospital by July 31, 2012, given the poor revenue stream. The poor revenue stream was largely due from debt, and competition from the only other LTAC operating on the Westbank. That competitor was Kindred Healthcare's LTAC which operated on the seventh floor of West Jefferson General Hospital ("West Jeff"). Daigle caused CSH to not pay the entire summer 2012 rent and the landlord, Commerce Street, Gretna L.L.C. sued CSH for eviction, and sued Daigle individually based on Daigle's his personal guarantee of $45,000 of the summer rent due.

11)

Daigle tried but was unable to sell Crescent City to a third party although he made efforts to sell to another hospital operator, Cornerstone Healthcare L.L.C.  Cornerstone had previously employed Fritschen.   On August 31, 2012, Matthews (acting in his capacity as Manager and majority owner of Lazarus), re acquired CSH -- this time he acquired 100 percent of membership interests of CSH d/b/a Crescent City from Daigle. Consideration for the acquisition was as follows: (1) $45,000 dollars cash and (2) certain sums of money to be paid from the Medicare EFT account. Matthews also agreed to pay Daigle a finders fee in the event Daigle was successful in securing buyer for CSH by December 31, 2012.  To secure that finders fee agreement, Daigle took a promissory note on behalf of the parent company which he owned, Camillus Hospital, LLC which was contingent upon the sale of CSH.

6

12)

Matthews had a private investor, Pastor Wilton Red. Pastor Red had previously invested in another Matthews' health services venture, PediaKare.   Dr. Red advanced funds to Matthews for him to acquire, manage, and operate an LTAC on the West bank. In exchange, Dr. Red was to receive a 35 percent interest in Lazarus, which acquired Camillus. Dr. Red also agreed to continue to support the hospital venture as need arose.

13)

On September 1, 2012 Mathews, on behalf of Camillus, paid $45,000 to the landlord to cover the rent that Daigle had personally guaranteed but did not pay. This was part of the consideration paid by Matthews for the acquisition of 100 percent of Camillus/Crescent City.

14)

On or about September  3, 2012 Matthews visited the home of Defendants Jimmy Morgan and Connie Morgan, and Red River Management, L.L.C. ("Red River") and negotiated for Red River to provide "back office management" only at Crescent City in exchange for a monthly management fee of approximately $10,000 per month. The Morgans accepted.  It was expressly understood that Charles Matthews himself would be the sole manager of hospital, would handle hiring and firing of employees, controlling the accounts,  and would be the only person who had check signing authority,. Red River was to handle processing of Accounts Payable, payroll, the patient assessment process, and the audit of medical records and human resources.

15)

In September 2012 the Landlord rejected the late rent payment of $45,000 dollars made on behalf of Camillus/Crescent City and served an eviction suit on CSH and Daigle based upon Daigle's personal guarantee of $45,000.

16)

Matthews retained New Orleans attorney Riccio, to defend the Eviction proceeding on behalf of CSH. Riccio was also to attempt to negotiate an arrangement with the landlord for continued operation of the LTAC with a reduced rent. She filed Exceptions and Objection to Summary Proceeding. On 9/ 18 / 2012 a hearing was scheduled on the eviction. Camillus' objections to the eviction were heard by the Court in chambers, and resulted in a delay of the eviction and delay of

7

the trial until 9/26/2012 to allow the landlord and plaintiff an opportunity for further briefing as to why the formal eviction should proceed as prayed for.

17)

While the activities were occurring with Camillus/Crescent City, plaintiff Matthews learned of a possible opportunbity to acqire another LTACH located at West Jeff Hospital. This LTACH at West Jefferson Hospital was Cammillus/Cresent City's only true competitor.

18)

Matthews sought the services of Defendant, Stephen Sullivan and his law firm, Sullivan Stollier and Knight,  all of whom are named as Defendants herein, with regard to legal services connected with the West Jefferson LTACH deal.

19)

Specifically, on Friday, September 7, 2012, plaintiff, Matthews received information from a marketer, Dale Clayton, informing him that Crescent City's only  competitor on the Westbank, Louisiana Specialty Hospital (LSH) owned by KINDRED HEALTHCARE, INC. ("Kindred"), had informed West Jeff. Management that the LTACH was moving and giving up the lease of the seventh floor (together with office space on the Fifth floor). Kindred operated Louisiana Acute Care, L.L.C. as   a privately owned LTACH located within West Jefferson Medical Center, the host hospital (what Kindred refers to as an "HIH"). Under this arrangement, Kindred leased the space and purchased certain ancillary services from the host hospital and provided the host hospital with the option to discharge a portion of its clinically appropriate patients into the care of the Kindred hospital. The HIH also received patients from general short-term acute care hospitals other than the host hospital. The acute care hospital, had been the chief source of competition for patients at Camillus.  LSH was an opportunity of a lifetime for Matthews. The reason was that LSH was grandfathered in with respect to referrals and was exempt from the three-year moratorium established by the SCHIP Extension Act.  Unlike others, this LTACH could receive 100 percent of its patients on referral from West Jefferson Medical Center. West Jeff offered all private rooms whereas Camillus was only licensed for semi private. Furthermore, the rent was substantially less than that

8

which CSH was paying for Commerce Street in Gretna.    This was the first notice that anyone outside West Jeff and Kindred had that Kindred intended to vacate the West Jeff host hospital facility. Matthews had a good relationship with Dr. Cashman, the Medical Director for the Kindred facility,  and Dr. Cashman arranged a meeting for the purpose of introducing Matthews to Nancy Cassagne, administrator for West Jefferson Hospital, the lessor. Dr. Cashman called Ms. Cassagne. Matthews determined that Kindred had given formal notice that it was vacating the premises on November 1, 2012. West Jefferson was concerned because West Jefferson was going to lose the LTAC services it needed for the community.  Dr. Cashman agreed  that he would  recommend Charles Mathews, who owned CSH, to Cassagne and set up a meeting between Matthews, Mike Rabalais and Ms. Cassagne regarding the lease.  They met at 3:00 p.m. on that same day. They discussed a lease agreement for Camillus/Crescent City to be moved to West Jefferson General hospital after Kindred vacated the premises. This was confirmed by emails dated Saturday September 8, 2012 Rabalais to Cassagne and Matthews to Cassagne following the meeting.

20)

Matthews consulted with defendant, attorney Steven Sullivan, of the defendant law firm Sullivan Stolier and Knight in connection with preparing a lease agreement and letter of intent. At the time Matthews was not aware of the very strong relationship between defendant Steve Sullivan and defendant Jimmy Morgan of Red River, although he was aware that Morgan had done some consulting for one of Sullivan's client.

21)

Following Matthews negotiation of the 7th floor lease space to move and operate the LTAC at West Jefferson, on September 7, 2012 plaintiff Matthews called attorney Steve Sullivan of Sullivan Stolier and asked him to represent Matthews in connection with the preparation of the formal lease documents between Camillus/Crescent City and West Jeff.  By September 10, 2012 at 5:47 by email, Sullivan's associate, Thuy Huynh had contacted government Center for Medicare Services ("CMS") officers, Lori Guillory and Tonja Collier, by email, on behalf of the client, Charles Matthews.  Huyng advised Guillory that Camillus/Crescent City would be relocated to West Jeff Medical Center, given that that Kindred had closed or intended to shut down its LTAC facility there. She requested "an expedited and abbreviated relocation approval" on Matthews and CSH' behalf.

9

22)

At the same time that West Jefferson management offered Matthews the opportunity to operate an LTAC at West Jefferson because Kindred was vacating, the Crescent City landlord was refusing the rental funds and continuing with the eviction proceeding and move for immediate eviction of Camillus from the premises.

23)

By September 11, 2012 Sullivan, on behalf of Matthews and at Matthew's express request, attempted to contact Kindred through email and phone call made to Charles Keckler of Kindred but was unsuccessful. On September 12, 2012, at 1:05 p.m. on behalf of his client, Matthews, Sullivan contacted lawyers for West Jeff, and requested a copy of the existing lease between Kindred and West Jeff. In that email he told her he "looked forward to working with her "to achieve our clients' goals." Matthews was updated, with Sullivan's assurance by email, that "this hospital would become a crown jewel of Matthew's already impressive career."

24)

Matthews needed to keep Crescent City operating while negotiations were underway for moving to the LSH former facility -- West Jeff's 7th floor. On or about the week of September 10, 2012 Matthews delivered an additional 20,000 dollars to MDA owner, Daigle, who still had control of the CSH account, which was then offered by check from MDA to the landlord, to pay the balance of the rent (August 2012) and interrupt the eviction. The landlord refused the funds. Because of CMS regulations regarding maintaining the average daily stay, it was essential that Camillus/Crescent City continue operating at the Commerce Street location, despite the eviction proceeding, until Crescent City could be moved to West Jefferson. However, the West Jefferson premises would not be available to occupy for several weeks or until November 1, 2012. Interruption in operations, in violation of the LTAC's own policy and procedures, or CMS federal regulations, could result in forfeiture of CSH' right to continue to operate Crescent City hospital under its Medicare provider number.

25)

Matthews also retained attorney Marie Riccio to defend the eviction proceeding that had been served and was pending. Riccio filed responsive pleadings on behalf of CSH. Following motions heard in chambers, the eviction trial was continued to September 26, 2012. A judgment of eviction

10

was issued but Riccio successfully secured a suspensive appeal with Matthews' own personal surety bond enabling CSH Crescent City to remain at the Commerce Street location at that time while preparing to move to the 7th Floor at West Jefferson Hospital.

26)

By September 15, 2012, after it was known in the community that Kindred was closing down, and was not accepting any more patients, Camillus began to receive approximately 12-15 patients per day at the Crescent City hospital confirming rumors that Kindred was leaving the area.

27)

On September 21, Sullivan advised Matthews that "lease negotiations were on track" and he would discuss early occupancy with Jan Turk (West Jeff) Camillus/Crescent City LTAC could not move in until Kindred was out of the space. (This ultimately would not be until October 19, 2012.)

28)

On or about September 21, 2012, Michael Shultz, partner with Sullivan Stolier and Knight, prepared a lease agreement on behalf of Matthews and CSH, for purposes of presenting same to West Jefferson Medical Center. However the information contained therein was incorrect respecting provider number and other critical data.

29)

Mike Rabalais, CSH/Crescent City's Administrator, with input from owner, Matthews prepared another lease, negotiated the terms with West Jeff, and presented it to West Jefferson counsel who signed it and forwarded it back to him. The lease agreement, prepared by Rabalais, between CSH/Crescent City and West Jeff was ultimately signed by on September 25, 2012. Rabalais signed as CSH' administrator and Nancy Cassagne signed on behalf of West Jeff.

30)

On or about the 25th of September, Matthews learned from the hospital administrator at West Jefferson that Kindred was not actually relocating the LTAC but intended for internal corporate reasons to shut it down. Matthews immediately realized that the Kindred provider number was uniquely valuable because the Kindred provider number was "grandfathered in" with regard to a

11

regulation that required that a general hospital (such as West Jefferson ) may not refer more than 75 percent of its patients to the LTAC that leases space in the hospital. Kindred, which had been in existence for more than twenty years and was not bound by a rule that restricted Camillus from receiving more than 25 percent of its patients from a single source host hospital.

## 31)

Matthews informed Sullivan that Kindred's LTACH had a "grandfathered" provider agreement, which allowed Kindred's LTACH to receive 100 percent of its patients from the host hospital, West Jefferson Medical Center.  Furthermore, pursuant to the Medicare, Medicaid and SCHIP Extension Act of 2007 (the "SCHIP Extension Act"), a three-year moratorium has been imposed on the establishment of a LTAC hospital or satellite facility, subject to exceptions for facilities under development".  In short, after the closing of Crescent City, Kindred would be the ONLY LTACH in existence on the Westbank as a result of the moratoriums, and it was grandfathered in – all of its patients could come from the host hospital. It did not need to market or advertise, or recruit physicians to make referrals to the hospital. Kindred, unlike CSH/Crescent City was not burdened with debt. All of this made Kindred an extremely valuable LTAC and a tremendous business opportunity for Matthews, the client. Therefore, purchasing Kindred was an infinitely greater and more profitable venture than moving the Crescent City license and operating agreement to West Jefferson.  The fact that Kindred was to be for sale was a stunning turn of events for Matthews.  Matthews informed his lawyer, Sullivan, that he was interested in an outright purchase of the Kindred LTACH for this reason.

## 32)

Kindred's advantage over CSH/Crescent City, the only other LTACH on the West Bank, became even keener upon the expiration of the moratorium that had been placed on the enforcement of several new rules.  CMS has other regulations governing payments to LTAC hospitals that are co-located with another hospital, (in this case West Jefferson) such as a HIH. CMS has regulations governing payments to a LTAC hospital that is co-located within a host hospital ("HIH"). As of December 31, 2012 the rules generally limit Medicare payments to the HIH if the Medicare

admissions to the HIH from the host hospital **exceed 25%** of the total Medicare discharges for the HIH's cost reporting period of the total Medicare discharges for the HIH's cost reporting period, known as the "25 Percent Rule." There are limited exceptions for admissions from rural, urban single and MSA Dominant hospitals. Admissions that exceed this "25 Percent Rule" are paid using the short-term acute care inpatient payment system ("IPPS"). Patients transferred after they have reached the short-term acute care outlier payment status are not counted toward the admission threshold. Patients admitted prior to meeting the admission threshold, as well as Medicare patients admitted from a non-host hospital, are eligible for the full payment under LTAC PPS. If the HIH's admissions from the host hospital exceed the limit in a cost reporting period, Medicare will pay the lesser of (1) the amount payable under LTAC PPS or (2) the amount payable under IPPS. In the 2007 Final Rule, the so-called "25 Percent Rule" was expanded to all LTAC hospitals, regardless of whether they are co-located with another hospital. Under the 2007 Final Rule, all LTAC hospitals were to be paid the LTAC PPS rates for admissions from a single referral source up to 25% of aggregate Medicare admissions. Patients reaching high cost outlier status in the short-term hospital were not to be counted when computing the 25% limit. Admissions beyond the 25% threshold were to be paid at a lower amount based upon short-term acute care hospital rates.

33)

The SCHIP Extension Act placed a three-year moratorium on the expansion of the "25 Percent Rule" to freestanding hospitals. In addition, the SCHIP Extension Act provided for a three-year period during which the non grandfathered hospitals that are (1) LTAC hospitals that are co-located with another hospital may admit up to 50% of their patients from their host hospitals and still be paid according to LTAC PPS, and (2) LTAC hospitals that are co-located with an urban single hospital or a MSA Dominant hospital may admit up to 75% of their patients from such urban single or MSA Dominant hospital and still be paid according to LTAC PPS. See "– Governmental Regulation – Hospital Division – Overview of Hospital Division Reimbursement." SCHIP was further extended by ACA and later by the 2012 CMS Rule (as defined below). The ACA extended the moratoriums on the establishment of new LTAC hospitals or satellites and bed increases at LTAC hospitals or satellites, the application of a one-time budget neutrality adjustment to rates, and the payment reductions due to the very short-stay outlier provisions from three years to five years. These

13

moratoriums expired on December 29, 2012. The 2012 CMS Rule began a three-year phase-in of a 3.75% budget neutrality adjustment which will reduce LTAC hospital rates by 1.3% in 2013.

The ACA also extended the moratorium on the expansion of the "25 Percent Rule" to freestanding LTAC hospitals from three years to five years. Following the ACA, the moratorium on the expansion of the "25 Percent Rule" to freestanding LTAC hospitals was set to expire for cost reporting periods beginning on or after July 1, 2012. However, the 2012 CMS Rule further extended the moratorium to all freestanding LTAC hospitals with cost report periods beginning on or after October 1, 2012 and before October 1, 2013. This created a potential gap period. With respect to HIHs, the ACA extended to five years the period during which: (1) HIHs may admit up to 50% of their patients from their co-located hospitals and still be paid according to LTAC PPS; and (2) HIHs that are co-located with an urban single hospital or a MSA Dominant hospital may admit up to 75% of their patients from such urban single or MSA Dominant hospital and still be paid according to LTAC PPS. The 2012 CMS Rule further extended these periods to HIHs with cost report periods beginning on or after October 1, 2012 and before October 1, 2013. The 2012 CMS Rule also (1) provides for a one-year extension of the existing moratorium on the "25 Percent Rule" pending the results of an ongoing research initiative to re-define the role of LTAC hospitals in the Medicare program, and (2) allows for the expiration of the current moratorium on the development or expansion of LTAC hospitals on December 29, 2012.

34)

Because of its competitive advantage, the acquisition of LSH presented Matthews with the opportunity of a lifetime. Kindred's LTAC located within West Jefferson Medical Center, once again, had been in operation for more than twenty years and was grandfathered and not subject to the 25% rule. Matthews also had a unique advantage in so far as Matthews on behalf of CSH had already secured a lease contract to operate an LTAC on the seventh floor of West Jeff beginning November 1, 2012. Essentially if Kindred were to sell LSH Kindred would have to sell to Matthews or the buyer would have to move the LTAC to another location and no other location was really feasible. At the same time, Crescent City's landlord was indicating that he intended to exercise his right to "take back" that CSH/Cresent City's hospital license through the eviction process on the basis that

14

Daigle, operating the hospital through his company, MEDA, had breached the lease terms. The landlord in fact refused to accept the unpaid lease payments to resolve the eviction. Because the landlord was insisting on evicting Crescent City and exercising his claim to the license, LSH would be the only LTACH operating on the Westbank.

35)

Matthews communicated to his lawyer, Sullivan, that Kindred might be willing to sell the LTACH hospital and the provider number to him, Matthews. Kindred's decision to shut down coupled with the fact that Matthews had already arranged to formally secure the lease of the West Jeff space that Kindred was now scheduled to vacate by November 1, put Matthews in a unique position vis a vis the purchase of West Jeff LTAC after the corporate owners decided not to relocate in Louisiana. Given the eviction of Camillus /Crescent City and the landlords announced intent to take back that license, Matthews' opportunity to purchase Kindred, the only real competition, was enormous unexpected good luck. Matthews directed Sullivan to begin negotiations for the purchase of the Kindred provider number on Matthews's behalf.

36)

On September 25, 2012, on behalf of Matthews, his lawyer Sullivan called Brock Hardaway, counsel for Kindred, regarding the rumor that Kindred was not relocating. Sullivan advised Kindred that his client was willing to purchase the Kindred facility located at West Jefferson hospital and the provider number for Kindred LTACH. On behalf of his client, Matthews, Sullivan offered $500,000. The lawyers arranged for a call at 10:00 am on September 26 to discuss the purchase amount that. Miller suggested $800,000 with the sale including fixed assets /equipment. Matthews advised that his investor, Dr. Wilton Red, a preacher/pastor with was willing to invest in the hospital and would supply the required $150,000 down payment, thus permitting financing through Kindred of the remaining $650,000.

37)

Matthews directed Sullivan to form and file with the Secretary of State office a new LLC for purposes of purchasing Kindred facility.     Sullivan formed WJLT, LLC which was owned 100 percent by Charles Matthews and with Matthews as sole member and Manager.

38)

15

Sullivan began communicating with Sullivan's partner in other business ventures -- Dan Daigle -- the owner of *MDA and former owner of Camillus/Crescent respecting Matthews acquisition of the Kindred LTACH* Email exchanges exist, that took place on September 27th at 12:04 and 12:44 between Sullivan and Daigle, in which Daigle recommended the name to be given to Matthews' new company. He recommended EJLT, L.L.C. (corrected to WJLT by Sullivan reply email) as well as the terms of corporate creation, and suggested that Matthews should be the only member "subject to Charles approval". The latter is reference to the fact that plaintiff Dr. Red, Matthews investor, would NOT be included in the registered ownership of the new hospital.

39)

Sullivan replied at 12:44 pm on September 27th and forwarded same to Defendant Michael R. Schulze at Defendant Sullivan Stolier Knight LC who responded at 12:48 pm with a rough draft Letter of intent for review to Matthews, *as well as sending it to Daigle.* Plaintiff Matthews directed at 1:40 p.m. that the WJLT hospital name be changed "Lazarus7 Health Systems, LLC". Lazarus is the name of Matthews' own other company, the LLC, and which owned Camillus/Crescent City. However Sullivan rejected this and adopted the name suggested by Daigle -- WJLT Hospital, L.L.C.

40)

At 2:54 on September 27, Sullivan copied client Matthews and CSH administrator Mike Rabalais on the *non binding letter of intent that had already been sent to Greg Miller.* It explained a "proposed sale of the Membership Interests or the Assets of Louisiana Specialty hospital, L.L.C. d/b/a Kindred Hospital West Jefferson to WJLT, Hospital, LLC" (owned 100 percent by Lazarus, which was owned by Matthews), his investor, for $800,000.00, secured by a note requiring monthly payments equal to (5%) of the collections for the previous month.

41)

The Due Diligence provision (para. 3) in Sullivan's letter of intent on behalf of Matthews, which he had already sent to Kindred allows for only ten days review following Buyer's receipt from Seller, Kindred of materials listed on Exhibit "A" that was attached. Exhibit A included " Copies of all open Cost Reports and 2011 and current Balance Sheet and Financial statement together with documentation of the Average Length of Stay as defined in 42 C.F.R. 412.23(e) for the past six

16

months. The letter of intent also provided for what Sullivan stated was a "very limited due diligence period" and an Exclusivity Provision regarding due diligence during which time Seller could not discuss any offers for purchase of the membership interests.  Sullivan pushed for a closing by October 8th and no later than 15th. He advised that Crescent City wanted to move quickly and said there was "no need for any thirty day notice to DHH as required when a hospital voluntarily terminates it license and Medicare provider agreement".  Sullivan said the $800,000 offer was contingent upon a closing no later than October 15th. He also urged that the October 15 closing goal be met.  Matthews emailed Sullivan on the same date at 12:40 requiring that Exhibit A include an itemized listing of equipment.

42)

However once Sullivan fully realized the competitive advantage that the Louisiana Specialty Hospital had and that it was a potential gold mine,  Sullivan conspired, with the help of Morgan, to take it from his client, Matthews. Sullivan compelled Matthews through intimidation and duress, as set forth in detail below, to give Sullivan 4.9 percent of the hospital company to Sullivan and 4 percent to a hospital employee, Louis Cressy, who is Daigle's brother- in -law, leaving Matthews with 91.1 percent.  Sullivan also compelled Matthews, under duress, to name Morgan (who worked directly for Sullivan in other deals and who as events would show, did exactly as Sullivan demanded) as the sole manager for WJLT which would acquire LSH.  Sullivan threatened to kill the deal if Matthews did not agree.  Sullivan accomplished this by insisting that the deal go through quickly, by ensuring that all verbal communications regarding the purchase of Kindred were exclusively held between Sullivan (or his two associates) and Kindred's own officers so that only he spoke on behalf of Matthews, and by threatening to kill the deal and "pull out" if Matthews refused. At no time did Sullivan encourage or facilitate direct communications between Matthews and Kindred officers or a face to face meeting or video conference. Since Matthews' company CSH held the lease for the Seventh Floor at West Jefferson, to operate a LTAC beginning on November 1, 2012, Sullivan was hardly conducting a difficult negotiation – Kindred, if it was to be sold in place, could not be sold to anyone but Matthews because Matthews had the right to move in to the space on November 1, 2012 with his own other LTAC.  Kindred offered to sell Louisiana Acute Care, L.L.C. for 800,000 dollars (150,000 dollars cash and 650,000 dollars note) in a membership and asset sale.

17

A letter of intent was proffered by Kindred and Sullivan asked Matthews permission to sign the letter of intent as WJLT's representative.

43)

At 3:55 pm on September 27, 2012 Jeff Stodghil, Vice President and Corporate Counsel of Kindred in Louisville, forwarded a Confidentiality Agreement for WJLT to sign to facilitate the exchange of information between Kindred's affiliate hospital Louisiana Specialty Hospital, L.L.C., and WJLT Hospital, LLC. He said "Please forward an executed signature page to me and I will send on to you a copy executed on behalf of Kindred."

44)

At 4:15 pm on September 27, 2012 Sullivan advised Jeff Stodghill as follows: "Looks fine. I'll get my clients ok and return it to you today."

45)

Matthews then received a verbal communication from Daigle (who had sold CSH to him on August 31, 2012) advising that Sullivan had called HIM, and informed him that Sullivan was requiring a 4.99 percent interest in the Kindred LTAC hospital that Matthews was purchasing, as a "bonus". Daigle informed Matthews that having his attorney Sullivan in Matthews' deal would be a "good thing" because Sullivan knew players in the industry, including investors who Matthews would need, and Sullivan could supply, and that Sullivan "carried a good name".

46)

The timing was critical. At the same hour that Sullivan held the Kindred Confidentiality Agreement in his hands, Sullivan began to squeeze his client Matthews for a percentage of the deal, the implication being that if Matthews did not agree, his lawyer, Sullivan who held all the documents, and had held the pertinent communications, could kill the deal.

47)

Forty Minutes later, at 4:34 p.m. on September 27, Sullivan himself personally signed and executed the Confidentiality Agreement, and forwarded that with the Letter of Intent that he stated was "signed earlier today": The Confidentiality Agreement was signed only by Stephen M. Sullivan on behalf of WJLT Hospital, L.L.C. , and under Title, it states "Authorized Representative".

18

48)

At 4:36 p.m. Stodghill replied to Sullivan that he needed to "discuss this with our team". The email indicates that Sullivan at 5:34 p.m. sent Stodghill the executed Letter of Intent as well as the Confidentiality Agreement.

49)

At 4:52 p.m. Sullivan, in an email, forwarded two client attorney engagement letters to Charles Matthews. He informed him that "we" have formed WJLT Hospital L.L.C. as the holding company for the member in the Kindred LTCH, WJMC". Sullivan says that he has attached an engagement letter for WJLT hospital, LLC and a "new" engagement letter for Camillus Hospital, LLC d/b/a Crescent City Specialty.

50)

On September 27, 2012 WJLT was created. It was owned 100 percent by Charles Matthews. However there was no prior engagement letter. Sullivan had previously represented Matthews in 1999 in connection with other matters. In connection with those other matters, Sullivan had merely his firm's hourly rate for services.

51)

On September 27, 2012, Camillus Hospital, LLC (referred to by Sullivan) was owned by Daniel Daigle but it no longer owned or operated Crescent City Specialty. Crescent City Specialty was owned by Camillus's subsidiary, Camillus Specialty Hospital LLC (CSH). CSH was owned by Matthews. Daigle had sold CSH/Crescent City to Matthews on August 31, 2012 by selling 100 percent of CSH to Matthews own company Lazarus on that date.

52)

However, in the same email dated  September 27, 2012 and sent at 4:52 p.m., Sullivan advised his client, Matthews,  that "he was grateful for " and accepted  Matthews' offer of a 4.99 percent ownership interest Louisiana Specialty hospital, LLC which would soon be owned 100 percent by WJLT, Matthews' own company. Sullivan also states: "note I have, because of your kind offer of a 4.99 % interest in both L.L.C.s, I am required by the ethical code for lawyers to make a disclosure whenever our firm enters into a business transaction with a client." There was no

19

"disclosure" attached. Nor was there any reference to the specific express ethical disclosures that exist under Louisiana law and Disciplinary Rule if a lawyer was determined to take an interest in his client's business while representing him on a transaction involving that business.

53)

Furthermore, Matthews never "offered" this "bonus" to Sullivan. He never had any discussion whatsoever with Sullivan regarding a gift of 4.99 percent ownership interest in his hospital companies. Matthews assumed that he was being charged legal fees on an hourly basis as he had been charged in the two prior hospital deals for which Sullivan had represented him.

54)

Sullivan discussed the sale terms with Matthews which included an option to purchase just the membership interests or alternatively to purchase the assets and membership interests. While Sullivan as acting as Matthews counsel, Sullivan advised Matthews to purchase Kindred membership interests and assets. Sullivan advised Matthews to minimize the "due diligence" because he wanted the sale to go through quickly.

55)

On October 9, 2012 Sullivan sent an email to Matthews asking him to have Dr. Red who was posting $150,000 sign a letter. Sullivan advised that Morgan was to be appointed manager for the new venture. On October 10, 2012 at 7:36 a.m. Matthews sent an email to Sullivan objecting to Sullivan's advice that Morgan be appointed manager in the Operating Agreement that Sullivan was drafting. On or about October 10, 2012 at 2:08 p.m. Sullivan sent Matthews a draft of the Operating Agreement for WJLT he had prepared by email. Once again Sullivan told Matthews he was "grateful" for the 4.9 percent that Matthews had "offered" him. Sullivan told his client Matthews that he must execute an Operating Agreement in which Red River Management would be the sole manager of WJLT before the deal would close. Matthews objected to Red River management being the manager of the LLC because Matthew was 100 percent owner of WJLT and intended to be the manager of the LLC. On or about October 10, Sullivan, even though CSH/Crescent under eviction order for the failure to pay rent in June through August while owned by Daigle, also advised Matthews that Matthews must give 10 percent ownership of WJLT to CSH/Crescent City which Matthews had purchased from MDA three weeks earlier,.

20

56)

The sale of CSH/Crescent City to Matthews had included terms for repayment, from Medicare funds that would be coming in to the EFT account from treatment of previous patients, to Daigle of his family's initial investment. The sale also included a side agreement that stated that should Lazarus sell the LTAC prior to the end of the year, December 31, 2012, MDA (Daigle) would receive $500,000 from the sale. This agreement for a finders' fee was imposed by MDA because MDA had tried to sell CSH to a non related entity in July for $350,000 but was unsuccessful. Daigle wanted to share in any profit if a deal for the sale of Camillus did take place after he was no longer the owner of the LTAC, but within six months of the transfer of the LTAC to plaintiff Matthews.

57)

On or about October 10, 2012 Sullivan also advised Matthews that he must give 4 percent of the hospital that operated at West Jeff whether CSH or the Kindred LTACH to Mr. Louis Cressy, an employee nurse assistant. Cressy is Daigle's brother-in-law.   In Sullivan's draft Matthews himself would receive a less than 50 percent minority membership.

58)

On October 11, 2012 Matthews asked Riccio, who until that time was only retained to defend CSH in the Jefferson Parish eviction proceeding, to review the WJLT Operating Agreement which that Sullivan had presented to Matthews. Riccio requested that the draft agreement be sent to her. Sullivan advised that time is of the essence, the deal is ready to be closed but it won't be closed until the Operating Agreement is done.

59)

Sullivan sent a copy of the proposed Operating Agreement to Riccio.   In the proposed Operating Agreement, Sullivan states Matthews must agree to:

1) award a 4.9 interest in the new company to Sullivan/Sullivan and Knight and

2) to have Jimmy Morgan be the sole manager or Sullivan will kill the Kindred deal by declaring that he "was out of it"

3) give Billy Cressy (an employee who is Daigle's brother in law) 4 percent of the new company,

4) give Camillus Hospital, LLC, 10 percent of WJLT (at that time Riccio believed Camillus/Crescent City was evicted, and was about to lose its license, and had debt).

21

60)

Matthews objected to several of the proposed terms of the Operating Agreement, primarily: (1) the requirement that the agreement required full management by Jimmy Morgan, and; (2) the 10 percent interest to Camillus which had no assets due to the eviction. There was no justification for saddling WJLT with Camillus' debt. Matthews was agreeable to giving Billy Cressy 4 percent, but insisted he wanted to run his own company. Sullivan informed Riccio that it was Daigle who wanted the 10 percent provision and the Billy Cressy provision. Daigle informed Riccio that he asked Sullivan to include the 10 percent provision so that CSH's unpaid vendors will be protected Upon information and belief, Daigle advised Sullivan not to transfer the CSH lease with West Jeff to any other company if the percentages of ownership were not set up as he Daigle suggested. Despite not knowing why Sullivan was so insistent on meeting Daigle's concerns, (Daigle, at that time, did not have any ownership in WJLT or CSH/Crescent City any longer), Matthews directed Riccio to cut the best deal she could because Matthews believed, based on representation of Sullivan, that Sullivan could jeopardize the entire Kindred deal. The negotiations become very heated, with Sullivan becoming irate as Matthews refusal to go along with Morgan as manager. Because only Sullivan was in contact with the sellers and kept Matthew out of the contact sphere, it appeared that no one else could take over negotiations and it appeared as if Sullivan had the ability to kill the deal.

61)

Sullivan informed Matthews that the negotiations with Kindred personnel made clear that the sale to Matthews would only go through because Kindred was "comfortable" with Sullivan's involvement in the deal, as a consequence of his "reputation" and his representations respecting Matthews' ability to see the deal through. Sullivan advised Matthews that his firm is entitled to the 4 percent because the firm had done "enormous work for which he had not been paid", he would have to do more before the deal was consummated, and that his expertise was the reason Kindred was at the bargaining table at all. At the time, based upon the documents in hand, or lack thereof, there appeared to be no reason to dispute Sullivan's representations.

62)

On October 12, 2012 a meeting was held at Riccio's office with Daigle and Matthews. An arrangement that Daigle would receive a full indemnification from WJLT for all his personal

22

exposure and any other liability he or any of his companies or family companies could exposed to by Camillus vendors or creditors. In exchange, CSH would not receive 10 percent interest in WJLT. Daigle was satisfied.  In the meanwhile Daigle agreed to assist with the negotiations with Sullivan who was still insisting on Jimmy Morgan being the only manager.

63)

The negotiations on behalf of Matthews with Sullivan who was to receive a minority interest, became extremely tempestuous.  Sullivan informed Matthews several times that Kindred will not close the deal unless the Operating Agreement was confected as he wanted it to be, and Morgan was sole manager.  Sullivan began screaming on the telephone, and threatened to kill the deal by "backing out".  Sullivan claimed that once he told Kindred he was out of the deal, Kindred would be released from the Letter of Intent that he had signed, and Matthews would completely lose the West Jeff hospital deal.

64)

Matthews had no way to test Sullivan's contention that Kindred would not close the deal without Sullivan's participation as an equity partner and Morgan's management,   Because all negotiations were conducted solely between Kindred's lawyers and Sullivan, neither Matthews nor other counsel for Matthews was invited to any negotiation sessions nor copied on any of the emails between them. Matthews understood that the deal was about to close and that Sullivan was holding the deal hostage. At that time Matthews also learned that a very large portion of Morgan's work came through Steve Sullivan.

65)

On October 15, 2012 at 5:41 p.m. Sullivan said there was no update on the hospital sale closing date and that he would make Operating Agreement changes.  Referring to operating Agreement, Sullivan said "THERE CANNOT BE A CLOSING UNTIL IT IS SIGNED." Sullivan repeated that theme in several emails and text messages threatening Matthews that if Sullivan did not get the Operating Agreement terms he wanted, he would walk out and the deal would not close as scheduled in the LOI. Sullivan insisted the Kindred sale would not take place if he pulled out of the deal and he would not cooperate with his client any further unless he, Sullivan received 4.9 percent voting share, the Operating Agreement could not be amended without his approval, and Morgan was the sole manager.

23

66)

After several heated conversations between Sullivan and Matthews, at Matthews's direction, Riccio sent Sullivan a revised Operating Agreement which included a nine month gestation period for Morgan's tenure as manager.  In the final agreement, with notice, Matthews could be rid of Jimmy Morgan and resume control of his own company, and during that nine month period Sullivan's 4.9 percent could be bought out for $250,000, or 6 times EBITA ("Earnings Before Interest, Taxes, and Amortization and Depreciation). That calculation was derived after Riccio demanded to know from Sullivan how Matthews could take his company back, buying out Sullivan's interest so as to be rid of him, once the deal with Kindred was done.  After additional back and forth, Sullivan consented to complete the deal on Matthews' behalf  in exchange a 4.5 interest,  with the buyout provision of $250,000 or 6 times EBITA.

67)

Michael Shultz, an attorney with Sullivan's law firm, was doing the actual preparing of the Operating and Executive Agreement together with Sullivan. Unfortunately Schulz was negligent and followed only what Sullivan directed and ignored Matthews' (his client's) own interests.  Upon information and belief, Schulz merely prepared the Morgan Management agreement Sullivan had directed.  Matthews objected because it granted excessive power to Morgan as manager. The management agreement included a provision whereby the voting shareholders, including the minority 4.9 percent member, Sullivan, could veto any action or direct any action taken by the manager. Morgan also was promised $20,000 dollars per month compensation in that agreement.

68)

Fearing that Sullivan would kill the deal as threatened, on October 18, 2012, Matthews, under duress by Sullivan,  finally signed the final version of the Operating Agreement that was hammered out.  On that date Matthews also, on information and belief, signed  the Morgan Management Agreement.  Immediately after Matthews signed the Operating Agreement, Sullivan closed the Kindred sale.

69)

During the same period of time, on or about October 19-21, 2012 Matthews reached an agreement with the Landlord respecting the CSH eviction suit. Matthews paid the landlord for the months that were in default and tendered the Crescent City  license to the landlord pursuant to the

24

landlord's lease and their settlement agreement.

70)

Matthews, (through his own investor Dr. Wilton Red) paid the $150,000 down payment to Kindred for the new company and the deal closed. Sullivan made no capital contribution to capitalize the venture, nor did Louis "Billy" Cressy, the other minority shareholder which Sullivan ( At Dan Daigle's prompting) had compelled Matthews to accept. Matthews took possession of the LTAC now called d/b/a Louisiana Specialty Hospital, ("LSH") d/b/a Jefferson Extended Care at West Jeff. He transferred the CSH/Crescent City patients and the employees and administrators to the new facility located at West Jeff. .

71)

Thereafter, Matthews received a phone call from officers of East Jefferson Medical Center asking him if his hospital, Jefferson Extended Care, would be willing to establish a satellite location within East Jefferson hospital. This was a phenomenal opportunity and Matthews and the Camillus administrator went to meet with EJ officials regarding moving some beds from Jefferson Extended Care to East Jefferson. They discussed clinical services, medical services, nursing services. EJ then provided Matthews with a Letter of Intent. Matthews' Administrator, Michael Rabalais, signed the letter on behalf of Jefferson Extended Care. A second meeting was then scheduled, and Sullivan wanted to attend as Matthews' counsel. Immediately after the meeting, Sullivan informed Matthews that he wanted another 5 percent interest in WJLT. Matthews informed that he did not and would not agree to that. Sullivan continued to press Matthews for another 5 percent interest for himself. Ultimately Matthews did not go forward with the EJ deal because of Sullivan's involvement.

72)

On October 27, 2012 Sullivan prepared a press notice, and sent it to Matthews and Morgan for review. It stated:

On October 19th Kindred Healthcare sold Kindred Specialty Hospital of Jefferson to Jefferson Extended Care Hospital. The hospital is qualified by Medicare for up to 56 long term care hospital beds. Kindred , headquartered in Louisville Kentucky , is a leading post acute care company and the country 's largest provider of Long Term Acute Care Hospital Services ( LTAC) , The LTAC which opened in 1993 is located within West Jefferson Medical Center and is one of the oldest continuously operating LTAC hospitals within a hospital in the United States . West Jefferson Medical Center is a major medical center located on the West Bank of the Mississippi directly across from New Orleans.
Charles Matthews is the CEO of Jefferson Extended Care. Mr. Matthews who owned an LTAC located within the Veterans Administration Hospital that was forced to close after Hurricane Katrina said he has assembled a dream team of the most experienced LTAC clinical, management and consulting personnel. Even though Kindred is an outstanding national company Matthews said Jefferson Extended Care's mission , as an independent , is to tailor make our services for our community . In that        way Jefferson Extended Care can offer treatment plans

25

that are more like "a custom made suit " for each patient , their family or other post discharge support system the patient may need .

As an LTAC Matthew's said, we serve medically complex patients straight out of ICU. Consequently we have a heightened duty to continually improve quality while also holistically considering the full scope of support necessary to maximize recovery. It's a duty we take very seriously and are enthusiastically looking forward to continuing the long tradition of excellence in LTAC services at West Jefferson.

73)

Matthews had only agreed to the Operating Agreement that Sullivan insisted upon once he was able to obtain a sunset provision that gave Morgan nine months to manage the hospital. During that time he intended to buy out Sullivan and thereby end the agreement .   In the meanwhile, Matthews and Mike Rabalais, his administrator, began to pay hospital obligations using the operating account and CSH funds that CSH loaned to WJLT .

74)

In October 2012 Jimmy Morgan opened an account on behalf of LSH in Chase Bank with himself and his wife as the only signatories. Through the latter part of October,   Sullivan insisted that Matthews turn over all funds to Jimmy Morgan and give Morgan COMPLETE CONTROL of the hospital accounts including the EFT account where Medicare reimbursement funds were deposited.  Matthews resisted because he owned 91 percent of the hospital, and he never wanted Morgan to be the manager in the first place. Matthews and Morgan talked again and Morgan was agreeable to doing back office only and Matthews would act as manager. He and Morgan reached an informal agreement but Morgan informed Matthews at that time it would be up to Sullivan – that he can only do what Sullivan tells him because that is where a lot of his business comes from. He admitted he was only involved because Sullivan (who provides contracts through his clients to Morgan) insisted upon it.

75)

A telephone conference was scheduled between Matthews, Morgan and Sullivan to discuss the fact that Matthews did not want to give Morgan sole access to the accounts and exclusive management authority . Matthews insisted Riccio be present.  It was pointed out that Morgan lived in Lafayette, had been in Alaska during the entire period they were attempting to negotiate his management contract, and he was not walking the halls of Jefferson Extended Care where a manager needed to be  as Matthews had been.  Sullivan continued to press during that call for Matthews to sign over all accounts to Morgan.  The call ended. Matthews became so frustrated he left the call.

26

Riccio asked Morgan to call her back after the call, but did not do so and did not respond to any calls Riccio made to him thereafter. Morgan clearly only did what Sullivan told him to do, and even though Sullivan was telling Morgan to take actions contrary to the desires of the majority owner, Matthews, Morgan would follow Sullivan's direction -- despite Sullivan being a 4.9 percent minority shareholder. The next day Sullivan, Morgan, and Matthews had a meeting in Lafayette. Matthews informed Morgan and Sullivan that as soon as the first $250,000 was available from the hospital billing, he was buying Sullivan out of his 4.9 percent. In the interim, Sullivan persuaded Matthew to sign over the WJLT operating account to Morgan, and Morgan agreed that once Sullivan was out of the company, he, Morgan would also be on his way. On November 2, 2012 Sullivan agreed to put up $71,000 to cover payroll while they waited for a Jefferson Extended Care's new Medicare billing number to be able to bill CMS for the patients that they were servicing.

76)

The initial sale between MDA and Matthews of 100 percent of the membership interest in Camillus/Crescent LTAC took place on August 31, 2012 before anyone knew of the opportunity to move to West Jeff. or directly purchase Kindred's hospital located at West Jeff. At that time CSH/Crescent City's and Kindred's LTAC were the only LTACs located on the West Bank. On October 18, 2012 Crescent City's license to operate was returned by Matthews to the landlord/original owner as part of the settlement of the eviction proceeding the landlord brought, based on rent not paid prior to August 31, 2012 . CSH/Crescent City's patients were transferred to West Jeff and the employees moved as well. However, revenues from CSH patients treated in September and October 2012, from Medicare, were still being deposited in the Crescent City(electronic funds transfer ("EFT") account at First Federal Bank in Lake Charles. The original August 31, 2012 sale included a provision whereby Daigle would only retain control of that EFT account until he was paid the monies owed under the Hospital Operations Agreement. Daigle received the requisite funds. At that point Daigle was obligated to release control of the EFT account.

With advice and knowledge of his counsel, Sullivan, Matthews intended to use the Crescent City revenues to make payroll at West Jeff. Matthews' company at West Jeff, WJLT/LSH, was still not receiving Medicare patient reimbursements because Morgan had failed to timely file for the billing number which required the submission of the Change In Ownership Interest ("CHOI").

77)
27

Matthews had to make Payroll on November 16, 2012 as well as the last of the settlement to the landlord which had resolved Daigle's personal liability and CSH's liability and in the absence of which the initial Judgment would be executory. Anticipating that Matthews would have the CSH EFT funds available, for transfer to the operating account, Matthews wrote checks to the Landlord on the CSH operating account. However, unbeknownst to Matthews at the time, Daigle had notified the First Federal Bank that he was legally entitled control of the EFT account and refused to agree to allow Matthews to transfer funds that were in the EFT account for Camillus. First Federal put a hold on the account. Daigle informed Matthews that he wanted Matthews' other hospital, St Charles Rehabilitation Hospital at Luling ("Luling") in exchange for cutting the funds loose. Matthews lawyer, Sullivan, informed Matthews that in order to have Daigle release the funds needed for LSH payroll, Matthews had to give his interest in the Luling hospital to Daigle. Matthews informed Sullivan that he had already sold Luling to the Luling manager, Chanelle Barnes in exchange for a $320,000 promissory note, payable in installments of 20,000 per month beginning in January 2012. That transaction had been handled by Chris Johnson, and Matthews filed the security interest under UCC provisions. Matthews also informed Sullivan on November 16, 2012, that he owned 100 percent of CSH, and the agreement to pay Daigle from the Medicare funds that came in had been satisfied, and he was entitled to the CSH funds at First Federal.

78)

Matthews steadfastly refused to give Luling to Daigle since he had already sold it to Barnes. Sullivan finally agreed to provide $71,000 to the LSH account to cover payroll on November 16th on condition that the monies be immediately returned to him as soon as the CSH account funds were released. The fact that Sullivan had received 4.9 percent interest in LSH for no consideration did not appear to enter his calculations. On receiving several assurances that the $71,000 would be returned to him as soon as Matthews had access to the funds Sullivan transferred funds to cover payroll.

79)

On 11/20/2012 Daigle sent an email to Sullivan stating that he "would not cause delay" in transfer of the EFT funds if Matthews signs a Bill of Sale, in which Matthews (through his company Lazarus) grants all of the membership interest of the Luling facility, New Orleans Rehabilitation Hospital, LLC ("NORH LLC") to Daigle's company, MDA. Additionally Daigle "requested" that the 4 percent which Sullivan had insisted be awarded to employee Cressy on the creation of the

28

Operating Agreement be purchased back for $50,000 cash.

### 80)

Based on emails from the bank, copy to Sullivan, First Federal would be willing to release the EFT account when presented with the appropriate documents, *that Sullivan's firm had in his possession*, showing the sale of 100 percent membership interest in CSH/Crescent City to Matthews on August 31, 2012. Despite this, Sullivan repeatedly contacted Matthews and repeatedly urged him to give Luling to Daigle.

### 81)

Matthews asked Riccio to intervene with the bank on his behalf. Riccio obtained, on behalf of Matthews, the CSH sale documents and provided them to the Bank. She obtained an Affidavit from Daigle respecting Matthews' ownership of CSH, transferred same to First Federal and the funds were released. Sullivan was immediately reimbursed the $71,000 that he had put up to cover payroll. The payroll crisis was over and had ended *without* Matthews having to give Luling to Daigle, which he had already sold to Chanelle Barnes.

### 82)

The Center for Medicare Services (CMS) and the Fiscal Intermediary, Wisconsin Physicians Services, ("WPS)", who processes the claims pursuant to WPS's contract with the federal government, and Department of Health and Hospitals ("DHH") requires that the owners and managers of hospitals receiving Medicare funds file a document providing the agencies with Change of Information as to ownership of Medicare facilities. ("The CHOI"). Billing on behalf of the new owners cannot take place until this is filed because it is required in order to receive the new billing number.

### 83)

Despite his client Matthews having purchased the hospital on October 18, 2013, and Sullivan's insistence that Morgan be the sole manager of the hospital through the Operating Agreement, by November 16, neither Morgan nor Sullivan , had prepared or filed the CHOI.

### 84)

Finally after several requests from Matthews, on November 16, 2013 at 2:48 p.m. defendant Sullivan sent an email to Matthews advising that LSH was to file a CHOI disclosing "all direct and indirect owners with greater than a 4.99 percent ownership interest, advising place and date of birth

of officers, directors, managing employees, etc." He advised his associate Thuy would complete the questionnaire and timely complete the CMS 855 CHOI. However, the documents received indicates that on November 14, 2013, defendant Morgan executed and signed as manager an 855 CHOI. The CHOI identified Sullivan Stolier as a 4.9 percent interest owner in WJLT and Charles Matthews as 91.1 percent. It identified James Morgan individually as manager, and Red River Management, L.L.C. as manager. Following Sullivan's direction, Morgan did not include the 4 percent that was owned under the Operating Agreement by the employee Louis Cressy. Therefore it appears that Sullivan had advised his associate Ms. Thuy to remove Cressy from the ownership without advising Matthews in advance, without his consent, or having any ownership change documents prepared or executed. Sullivan subsequently claimed when discussing the CHOI that any amount less than 5 percent should not be included in the CHOI.

85)

However Sullivan's and Morgan's delay in filing the CHOI contributed to Matthews having no funds to operate the hospital from the date it closed October 18, 2012.

86)

Additionally Sullivan had made no provisions whatsoever in the sale deal with Kindred for Kindred to continue billing and with reimbursement to Matthews of monies attributable to his patients. Instead Sullivan had written in a provision whereby the Kindred EFT account for the West Jeff LTAC would not be released until December 15, 2012. By that time Sullivan had successfully ensured that Matthews was eliminated from ownership.

87)

.   In November after the CSH EFT account was released to Matthews, Sullivan prepared a document and sent it to Matthews urging him to transfer his interest in the Luling promissory note to Daigle without any financial consideration or quid pro quo whatsoever. In text messages and phone calls, defendant Sullivan on a daily basis told Matthews that Matthews had to agree to sign the papers prepared by Sullivan's firm.

88)

On November 20, 2012 at 7:10 a.m. Matthews once again informed Sullivan that he had

30

already sold the hospital to the Luling hospital manager, Chanelle Barnes. Barnes had executed a promissory note payable to Matthews in exchange for the hospital. That note was to pay $20,000 a month. Matthews wanted to keep his interest in receiving those payments. Documents were presented transferring the hospital to Daigle's company MDA. Matthews refused to sign it.

89)

As of the end of November, the new West Jeff venture still did not have a provider number. During the last week in November, Matthews was desperate to find funds to make payroll on November 30, 2012. Matthews gave Sullivan authority to negotiate with potential investors and he himself also began reaching out to investors. Sullivan began negotiating and preparing a Letter of Intent with a potential investor Restora Health Care, for the investment of capital in LSH, because of the cash crunch Matthews was confronting. The cash crunch was the direct result of Sullivan and Morgan's delay in filing the CHOI which delayed being given a provider number so that Matthews could bill for the patients they had been treating since October 18. It was also the direct result of Sullivan's failure to negotiate standard terms for the seller Kindred, to continue to bill during the initial operations, pending the receipt of the purchaser's new billing number from CMS.

90)

On Monday November 26, 2012 at 11:52 pm Restora, acting through Greg Sassaman advised that defendant Morgan reiterated his understanding from Sullivan that there was an "immediate need of $250,000". He said they would not put up the next payroll on November 30, 2012 because "they couldn't move that fast". Sassaman confirmed that *Sullivan had stated to him, Sassaman, that Sullivan Stolier would make payroll on November 30, 2012*. Sassaman said that "they could then make the deal happen, if Sullivan would put up the payroll, and Restora would reimburse the $250,000 dollars within ten days". However, the payroll due for November 30 was only $83,000.

91)

Sullivan responded to Sassaman's email. He said that he "did not know for certain what the November 30 gap would be", he proposed a 9:30 a.m. call. He said he would "cover" the $250,000 but he would have to give an exclusive to a qualified operator other than Restora. He stated that the owner wants him to call others. He further reiterated that he would have to work on owner's equity, but would sign a Letter of Intent to purchase Matthews interest for 1.2 million dollars cash.

31

92)

Sullivan also texted Riccio, urging her to advise Matthews to sign over Luling to Daigle "in exchange for "getting back" the 4 percent interest in the West Jeff LTAC that Matthews had granted, at Sullivan's demand, to Mr. Cressy, Daigle's brother in law.   Sullivan couched his text urgings in terms of "needing the 4 percent in order to make the Restora deal happen". In effect Sullivan was saying -- "give Luling to Daigle, and because he controls Cressy,  Matthews will get back the four percent and that is needed for the Restora deal,  and if you don't, the Restora deal will not happen".  When Sullivan was asked expressly by Riccio, as to  "what Luling had to do with the Restora deal", Sullivan did not respond.

93)

A copy  of the RESTORA letter of intent was requested from Sullivan.  Schulz sent it the letter of Intent. On Riccio's direct reminder, Sullivan Stolier lawyer Michael Shultz confirmed that it was an all cash deal, with the 1.2 million dollar payment was to be made in cash.   Meanwhile, Sullivan was separately making clear to Matthews that the Restora deal depended on  Matthews giving Luling to Daigle. The Restora deal depended on Sullivan Stolier meeting payroll on November 30 and then being reimbursed.   To prevent Sullivan from "killing" the Restora deal, and to save the WJLT,  Matthews reluctantly signed the Luling sale document Sullivan sent to him. It purports to transfer to Daigle, through MDA, Matthews "interest" in the New Orleans Rehabilitation Hospital, L.L.C. d/b/a Specialty Rehabilitation  Hospital of Luling. Sullivan also bullied Matthews into assigning a $325,000 note to Daigle without consideration. From January to April, Chanelle Barnes paid more than 80,000 dollars on that note, which monies went directly to Daigle. However, despite having met Sullivan's demand that Matthews give Daigle the Luling promissory note,  the RESTORA Letter of Intent never left Sullivan Stolier's offices.  Schulz stopped emailing either Riccio on behalf of  Matthews or Matthews respecting the Letter of Intent and did no further follow up respecting Matthews agreement with Restora.

94)

Thereafter, despite "transferring" Luling as Sullivan demanded, Matthews was given to believe by Sullivan that the Restora deal was dead.  On Wednesday evening November 28, 2012,

32

Matthews desperate to cover payroll and make it until the billing number was received, spoke to Daigle regarding purchasing a portion of Matthews' interest in order to get past the financial hump. Daigle suggested he would buy in for a portion of the membership interest and help come up with payroll. On Wednesday 28th November Matthews also reached out to David Leblanc, owner of Life Care Hospital, a former employer of Charles Mathews in Shreveport, and current owner of Meridien Intel Hospital. Leblanc lives in Dallas Texas. Matthews informed Leblanc that he needed $100,000 for payroll and $400,000 to end of December because his hospital still did not have its provider number and the ability to bill for the patients. His belief was that the Controller who managed patient billing, Mike Freeman processed the request to CMS on October 22, 2012 but had still not received it back from CMS. Leblanc advised he would do a deal and negotiate an equity position and Matthews would still retain some ownership interest, and Matthews would continue to be a manager, receiving management fees. Matthews called Sullivan and told him that Leblanc could do a deal, and Sullivan agreed to forward the information that Leblanc required. Sullivan said he would forward the same package that Sullivan had sent to a prior potential investor, Cornerstone.

95)

On November 29, 2012  Mike Freeman returned Matthews' call  to discuss potential investors – he was trying to find someone to help Matthews make payroll.  Sullivan called Matthews and told him he was working the Cornerstone deal. On November 29, 2012 at 8:49 an email was delivered from Cornerstone to Mathews with a proposal that was rejected because it did not include the provision for Matthews to retain a membership interest. Cornerstone offered to put up payroll as a line of credit; assume management, and then put up another $300,00; Matthews was to receive $250,000 at end of December and another $350,000 at end of first year. It was not a fair offer. Cornerstone would only take Matthews for a buyout. Shortly thereafter on November 29, 2012, Leblanc, who Matthews had been negotiating with personally, informed Matthews that he could make payroll and he could do a deal.

96)

On November 29, 2012, in the mid- afternoon, Daigle spoke to Matthews and also later to Riccio and informed Riccio in person that Sullivan is going to "do the deal" and take over the hospital. Sullivan, he said was taking on three partners, he indicated one of them might be himself.

33

Riccio informed him of the RESTORA negotiation and LOI that was prepared by Schulze. She advised that Sullivan prepared a letter of intent, that Sullivan had offered to put up payroll to make the Restora deal work, but had also told Matthews that he had to agree to give Luling to Daigle in order for Daigle not " to kill the Restora deal". Riccio repeated that she told Sullivan that the Luling issue between Daigle and Matthews has nothing to do with the West Jeff hospital and Sullivan had a duty to represent and protect his client Matthews. Sullivan was aware that Matthews had another private investor who said he could make payroll and Matthews would still retain an interest. Daigle, during that meeting made a phone call which presumably was to Sullivan.

97)

David Leblanc called Matthews on November 29, 2012. Matthews was at a late lunch at Cheddars in Lafayette. Leblanc reported that Sullivan "had called him" and asked him "not to participate" because he, Sullivan, wanted the deal for himself. Steve Sullivan wanted to make his own deal and needed Leblanc out of the way. Leblanc said: "that is so unethical." He said he was sorry, but he would not stand up to Sullivan. He said he sympathized because " he had been cheated by his lawyer/friend once before also over a hospital deal". Matthews tried to speak with Leblanc again. On November 29, 2012 at 4:51 p.m. Matthews received a text from Leblanc saying he can't be in because of Sullivan. He said he was "caught between two friends".

98)

On November 30, 2012 at 5:15 a.m. Sullivan emailed Matthews and said it was "just dumb luck that Charles got the hospital – that it was all him and his ("Sullivan's) people that put it together". Matthews received the email and at 6:10 a.m. Matthews called Morgan and asked Morgan if there was any way that there were any monies available for payroll through an accelerated payment or other pre payment program that could be accessed to carry them through until the billing number came in. At 6:48 Matthews called Sullivan and Sullivan repeated to him verbally that it is just dumb luck that Matthews got that hospital.

99)

At 6:54 a.m. Matthews called Daigle and told him that Sullivan was screaming and threatening. At 7:05 a.m. Matthews received a text from Sullivan as follows:

"Sorry for raising my voice but the way the world works, unless you win the Powerball you don't get to retire; owning something you did not personally pay for and would not have

34

gotten with my and other's diligent work/ which you also did not pay for does not get you retirement income for you and your family for life!!"

100)

At 7:09 am Matthews called David Leblanc. At 7:30 a.m.  Morgan called Matthews and Matthews told him that he would rather let the hospital that he owned fail than be pressured into giving it to Sullivan. Thereafter, attorney Chris Johnson received a phone call from Stolier. Stolier told him that Matthews was going to be selling his company to an entity that involves Matthews' lawyers and asked Johnson to help out. Stolier told Johnson that he will pay any outstanding invoices for legal services that Matthews may have. Johnson was not given any details or history.   Thereafter he received the sale documents from Daigle.

101)

Matthews contacted Freeman -- he was trying to determine if the 855 form needed to obtain a payer number had actually been filed. Freeman returned the call, and Matthews then called Morgan, after speaking with Freeman.   Morgan said he filed the 855 form but he didn't have a copy of it. Later that day,  at Freeman's request Morgan sent Freeman the CHOI  (855) that he had filed and which was necessary for the billing.  It was not copied to Matthews,  although he  had asked for copy.

102)

Freeman called Matthews and asked whether the CHOI had been filed because he was attempting to determine what was holding up WJLT's electronic submission number. Until it was activated -- the billing had to be delayed. Freeman asked Matthews whether he was aware of anything regarding PIP payments. Matthews advised that he did not know about these payments. Matthews then called Morgan and asked Morgan about PIP payments  -- which Freeman in the previous  phone call  mentioned which were a possible source of monies.  Morgan said there were no PIP payments available. On November 30, 2012 at 10:50 a.m. defendant Morgan followed up the conversation with an email and said "Charles I don't think that hospital qualifies for expedited payments since Kindred is currently receiving payments for discharges prior to 10-19-2012". Morgan did not disclose to Matthews that Morgan had received a letter from CMS in November indicating that PIP payments had already been made by CMS which meant they were in the EFT

account, and that the continued payments would be suspended. The reason for suspension was

merely that he, Morgan, as Manager for WJLT, had not made or directed to be made the monthly

report required for PIP payments to continue. Morgan had apparently not responded to the letter and

apparently had made no effort to file the monthly report that was required in order to stop the

suspension and have the PIP payments continue.

103)

Morgan, by email at 10:29, then informed Matthews that "net payroll needed was 83,211.70

dollars and with payroll taxes the amount is about 110,000". He also said payroll taxes are due on

the two previous payrolls. He advised that rent on Kindred payments was due. Morgan advised

Matthews that it was his position that if Matthews was only covering payroll, Morgan would

terminate the management agreement.

104)

Later that day, on November 30, 2012 unable to make payroll, the RESTORA deal having

disappeared and Leblanc having withdrawn because Sullivan told him to, Matthews received from

Johnson a draft "Confirmation and Acknowledgment, Irrevocable Consent, Power of Attorney and

Indemnity" that Sullivan wanted Matthews to sign in order for payroll to be made by Sullivan.

105)

Sullivan in this document had manuevered and manipulated his own client Matthews unto

signing a power attorney that gives defendant Jimmy Morgan the right to transfer all of Mathews

membership shares in Matthews' own hospital, WJLT d/b/a Jefferson Extended Care, including its

valuable asset, the LTAC hospital license and provider number, to any company that Sullivan

designated.

106)

The Power of Attorney contained a Condition precedent, which was in the event of a sale by

LSH to JLTAC of all its assets including specifically Kindred Hospital.    In exchange, the Power of

Attorney stated that Sullivan had formed a new company, owned by him and his law partner, Steve

Stolier, which would be obligated to do the following:

    a.  JLTAC shall pay to LSH, and LSH will distribute to SJLT, and WJLT will
        distribute to Matthews, $85000 in cash.
    b.  JLTAC will issue to LSH a promissory note pursuant to which JLTAC shall
        promise to pay 1, 200,000 dollars to LSH as follows: (a) in year one, 105% of all

36

MCR receipts within 3 days of receipt, (b) in year two and following, 2.25% of all MCR   receipts within 3 days of receipt, (c) in no event shall monthly payments be less than 10,000 dollars and (d) on March 1, 25% of EBITDDAM (Earnings Before Interest Taxes   Depreciation Amortization and Management Fees) for the immediately preceding calendar year in excess of 1,500,000.

c.  That LSH shall issue to WJLT a promissory note pursuant to which LSH shall promise to pay 1, 200,000 to WJLT as LSH receives payments from JLTAC on the 1, 200,000     note made by JLTAC in favor of LSH.

d.  That WJLT shall issue to Matthews a promissory note pursuant to which WJLT shall promise to pay 1,200,000 to Matthews as WJLT receives payments from LSH on the 1,200,000 note made by LSH in favor of WJL.

e.  That JLTAC will issue to LSH a promissory note pursuant to which JLTAC shall promise to pay 271,000 dollars to LSH as follows: (1) in year one, .32 % of all MCR receipts within 3 days of receipt, and (b) in year two and following, .48 of all MCR receipts within 3 days of receipt, and (c) on March 1 of each year, 5 % of EBITDAM for the immediately preceding calendar year in excess of 1, 500,000 dollars.

f.  That LSH shall issue to WJLT a promissory note pursuant to which LSH shall promise to pay 271,000 dollars to WJLT as LSH receives payments from JLTAC on the 271, 000 note made to JLTAC in favor of LSH

g.  That WJLT shall issue to Wilton J Red a promissory note pursuant to which WJLT shall promise to pay 271,000 dollars to Pastor Red as WJLT receives payments from LSH on the 271,000 note made by LSH in favor of WHLT

h.  That JLTAC will grant a security interest in favor of Matthews in its provider agreement and license to secure the 1,200,000 note made by JLTAC in favor of LSH.

i.  That JLTAC shall agree that so long as any amount remains unpaid on the 1,200,000 note made by JLTAC in favor of LSH, JLTAC shall provide to Matthews financials and MCR remittance advises on a monthly basis.

107)

The upshot of this deal was that Matthews own lawyer, Sullivan, obtained control of Matthews' hospital and the very valuable hospital license, through the power of attorney, that he bullied Matthews into signing after Sullivan killed the investment deals that would have paid the payroll that Friday and saved Matthews from having to surrender his hospital. Matthews was given, instead of 91 percent of a very valuable hospital, a note in which Sullivan was promising to pay him 1, 200,000 dollars over many years. Ultimately it was determined that because of actions later taken by Daigle against Matthews in connection with CSH that the note was valueless. Nor has Sullivan made any payments on the note. Indeed, despite the condition precedent having occurred, neither JLTAC nor LSH has ever issued the promissory notes to WJLT that were guaranteed under the November 30, 2012 Power of Attorney.

108)

Matthews signed the power of attorney only because payroll had to be made that day and the efforts to obtain outside investors had failed.

109)

37

Matthews' own private backer, Dr. Wilton Red had provided payroll support to CSH and thus to WJLT, during the initial startup in September/October 2012 after Matthews acquired CSH and after CSH patients were moved to Matthews new company, WJLT/LSH. The sale of Kindred LTAC to Matthews (though his company WJLT of which he owned 100 percent) required a $150,000 cash down payment on a $800,000 dollar note.  On November 12, 2012 Sullivan drafted and provided a promissory note for signature to plaintiff Dr. Wilton Red, Charles' investor, in the amount of $150,000 dollars with 7 percent interest, payable in 45 days.  Matthew executed the note on behalf of WJLT, and Dr. Red wired the funds to Chase Bank to the Sullivan Stolier account, for purchase of Kindred's LSH. The note was to come due on December 1, 2013.

110)

The Power of Attorney strips Dr. Red of what is owed to him under the original note. It creates an obligation that will not be paid. WJLT has been stripped of its only asset -- the license to operate the LTAC at West Jefferson. Matthews, through ownership of WJLT, no longer owns a hospital. Sullivan, their lawyer, owns it.

111)

On November 30, 2012 Matthews signed the Power of Attorney out of desperation, because he did not believe that the hospital (controlled by Morgan) had the $80,000 -$100,000 needed to pay payroll.  However Matthews refused to sign any sale documents, transferring his company to Sullivan's group.  Nor was he willing to sign any documents that relieved Sullivan of his obligations to Matthews as his lawyer, or that indicated that he had waived any obligations or privileges.  The lawyer that Sullivan paid to represent Matthews (Chris Johnson) advised Sullivan that Matthews wanted to sign any sale documents himself, and to review them first.

112)

On information and belief, on or about November 16, 2012, Morgan received a letter from CMS stating that the PIP payments "will be suspended" for failure to supply the proper monthly report indicating that PIP payments had been previously made.  PIP is a Periodic Interim Payment Program administered by the Center for Medicare and Medicaid Services (CMS).  A PIP payment is

38

issued by Medicare and is intended to support the hospital by providing payments based on the information from prior cost reporting periods from the current fiscal year. The information is used, along with data from the last as filed cost report to adjust and provide monies on a stable basis to a facility while it is awaiting reimbursements from Medicare based on the costs sheets actually submitted. Morgan, sent the letter to Karen Middleton who works for Mike Freeman on the 20th of November. It merely required a response, merely a letter advising CMS that the membership had been sold but that the hospital was fully operating, uninterrupted and filing the appropriate monthly would have caused the PIP payments not to be interrupted or suspended.   **Morgan did NOT inform Matthews of this letter**. Morgan did not alert Matthews to the fact that PIP money was in the EFT account and could be used to pay payroll until the billing number was obtained and bills could be sent in. On information and belief Morgan did NOT file the proper monthly report or contact to avoid subsequent suspension.

113)

On information and belief, on Sunday, December 2, 2012, Mike Freeman, CPA, owner of Freeman Group, Cost Report Accountant, and the cost report and billing accountant for both Camillus and WJLT, sent an email to Sullivan stating that he has spoken at Sullivan and Morgan's request to Dan O'Neil an officer with CMS, and "there is PIP money in the account already". This email was NOT copied to Matthews even though he was still the owner of Jefferson Extended Care because no sale documents had been executed and the power of attorney that he had been forced to give Morgan on Friday the 30th had not been used to transfer his hospital to Sullivan or anyone else.

114)

On information and belief Freeman advised Sullivan on the 2d of December that he had told Jimmy Morgan about the availability of PIP money on the 29th or 30th of November. He advised that this meant "there will be no cash flow problems". He advised that "this may mean immediate cash flow for the company".  Freeman advised Sullivan that the company had been getting payments, and that these payments had been going to the Kindred account ( which Sullivan had engineered in his negotiations would be accessible in mid December after Kindred made sure that all the receivables that they had billed were pulled out). The only one signatory to that account was Jimmy Morgan. Sullivan immediately arranged to call Kindred and get the money.

39

115)

On December 5, 2012  ignoring Matthews insistence that he has to sign the sale documents, Sullivan directed his associate, defendant, Morgan, to actually sell the WJLT company shares to Sullivan's company JLTAC, using Morgan to sign "on Matthews behalf", acting on the power of attorney that Sullivan had obtained from Matthews.

116)

In fact by December 12, 2012 Sullivan and Morgan had made the proper response to CMS to that letter and accrued PIP payment of 794,000 was transferred from the EFT account at Kindred to LSH account. By that time Matthews had requested on December 5 2012 to review any sale documents prior to execution and his request was ignored.  When Matthews asked Sullivan to send him the documents to review prior to execution, Sullivan told him there was a procedure for members to get copies and it has to come from manager.  On Dececmber 7, 2012, ignoring Matthews requests for prior reviiew, Morgan himself signed the sale of Matthews' interest to Sullivan's group using  the Power of Attorney which had been obtained by improper coercion. On December 12, 2012, AFTER receiving the PIPS money, Sullivan signed the sale documents. The circumstances demonstrate that Sullivan was pushing to get the deal by Friday and he was not putting up cash, and he didn't want Leblanc because he would have the PIP money.  Matthews contends that the existence of the PIP money was withheld from him for the purpose of coercing him to, and improperly inducing him to, sign the Power of Attorney for the purpose of obtaining an unjust or unjust advantage.

117)

This lawsuit alleges the following causes of action, the supporting facts for which are detailed in paragraphs below for damages resulting from said actions as of November 30, 2012 and thereafter. On that date Defendants Sullivan Stolier and Knight, Steve Sullivan and Jack Stolier caused their client Charles Matthews to sign a Power of Attorney giving James Morgan power to act on Matthews behalf, which power ultimately on December 6 and 7 was used to transfer Matthews' hospital to Stephen Sullivan, Stolier individually and two other partners chosen by them and which formed Jefferson LTAC ("JLTAC"). At the time that defendants:

40

1)  professional legal negligence,

2)  breach of fiduciary duty,

3)  aiding and abetting breach of fiduciary duty,

4)  Civil law fraud,

5)  conversion,

6)   aiding and abetting civil law fraud,

7)  negligent misrepresentation and  negligent legal malpractice

8)  civil conspiracy,

9)  RICO, pattern of unlawful activity,

10) breach of contract,

11) breach of guarantee,

12) breach of covenant of good faith and fair dealing, and

13) breach of duty to account.

## FIRST CAUSE OF ACTION

## FRAUD IN THE INDUCEMENT

### 118)

The allegations above are repeated herein as if they were expressly set forth.

It is further stated that the Defendants Sullivan, Jack Stolier, Connie Morgan and James Morgan in failing to advise Matthews of the availability of the PIP monies prior to signing the Power of Attorney and prior to using the Power of Attorney to sell his hospital company to the defendants Sullivan, Stolier and their partnership JLTAC,  jointly concealed or failed to disclose a material fact that they knew the plaintiff was ignorant of or did not have the opportunity to discover, that they intended to induce him to take some action by concealing or failing to disclose the material fact, and that he suffered as a result of acting on the defendants' nondisclosure. Defendants, each of them had a duty to disclose that information to him. A duty to disclose arises where one makes a representation and fails to disclose new information that makes the earlier representation misleading or untrue.

## SECOND CAUSE OF ACTION

## BREACH OF FIDUCIARY DUTY

41

119)

The allegations above are repeated herein as if they were expressly set forth. Defendants including Sullivan Stolier and Knight, L.L.C. Sullivan Stolier, LC, Stephen Sullivan, Jack Stolier Michael Shulze, James Morgan and Connie Morgan breached the fiduciary duties that each of them, individually and together, owed to Matthews through the relationships and contract agreements that they had entered into with Matthews and his companies. They usurped Matthews opportunity to own and operate a profitable and valuable hospital company violating the duties of trust owed to him.

## THIRD CAUSE OF ACTION

## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

120)

The allegations above are repeated herein as if they were expressly set forth.

Defendants James Morgan, Connie Morgan, Jack Stolier, Michael Shulze, aided and abetted Stephen Sullivan and each other in the breach of fiduciary duty and violation of trust that was owed by Stephen Sullivan and Sullivan Stolier and Knight to the client, Charles Matthews, and his interests in the plaintiff companies, which was also the firm's client.

## FOURTH CAUSE OF ACTION

## CONSPIRACY UNDER CC ART 2324

121)

The allegations above are repeated herein as if they were expressly set forth.

Defendants James Morgan, Connie Morgan, Jack Stolier, Stephen Sullivan conspired in violation of CC art. 2324 to take Matthews' interest in the LTAC operating at West Jefferson, in violation of Art. 2315, the civil code articles related to fraud in the inducement, and to breach the fiduciary duties that they owed to Matthews and his interest in the plaintiff companies through the relationships and contracts they had with him..

## FIFTH CAUSE OF ACTION

## NULLITY OF THE AGREEMENTS

122)

The allegations above are repeated herein as if they were expressly set forth.

42

The Operating Agreement and Management Agreement with James Morgan and Red River Management which was entered into in October 2012, and the Power of Attorney entered into on November 30, 2012 as well as the contracts and other documents entered into on December 6 and 7, 2012 *and thereafter* by Morgan acting through the Power of Attorney, executed on November 30, 2012, were the result of fraud in the inducement. Together with as any other contracts entered into by the Defendants pursuant to or in related to said fraud in the inducement, they are null and void.

## SIXTH CAUSE OF ACTION

## (ALLEGED IN THE ALTERNATIVE) BREACH OF CONTRACT

123)

The allegations above are repeated herein as if they were expressly set forth.

Should this Court determine the December 2012 contracts and the Operating Agreement and Executive Agreements and Management Agreements are valid, the Defendants are liable for breach of contract for failure to meet the terms there under including the provision of monthly payments to Matthews and the companies in which he has an interest.

## SEVENTH CAUSE OF ACTION

## BREACH OF EMPLOYMENT CONTRACT FOR SERVICES BY SULLIVAN, SULLIVAN STOLIER, SULLIVAN STOLIER AND KNIGHT, JACK STOLIER AND MICHAEL SHULZ

124)

The allegations above are repeated herein as if they were expressly set forth.

The Defendants Sullivan, Stolier, Sullivan and Stolier, Sullivan Stolier and Knight and their agents, officers, legal partners, and employees are in breach of the employment contract for legal services entered into by them in September of 2012 to advance and protect the legal and property interests of their client Charles Matthews and his interest in the plaintiff companies.

## EIGHTH CAUSE OF ACTION

## BREACH OF FIDUCIARY DUTY OWED BY MANAGER MORGAN AND RED RIVER

125)

The allegations above are repeated herein as if they were expressly set forth.

43

Defendants Connie Morgan, James Morgan, and Red River Management are in breach of the fiduciary duties owed by them as Manager to the majority owner of the company, Charles Matthews, and to his company, WJLT, L.L.C., LSH, and to his interest in the plaintiffs companies.

## NINTH CAUSE OF ACTION

## CC ART. 2315 AND PROFESSIONAL NEGLIGENCE

126)

The allegations above are repeated herein as if they were expressly set forth.

Michael Shulze is liable for violations of C.C, Art. 2315, and on the grounds of professional negligence including legal malpractice for his failure to take appropriate actions to protect Matthews and his interest in the plaintiff companies. James Morgan and Connie Morgan and Red River Management are liable for violations of C.C, Art. 2315, ordinary negligence, and professional negligence for failure to take appropriate action to protect Matthews and his interest in the plaintiff companies. Sullivan Stolier and Knight LLC, its members, agents, associates and employees and agents are liable directly and under principles of vicarious liability, master servant doctrine, and respondeat superior, for violations of C.C. Art. 2315, for ordinary negligence and for professional negligence for the failure to take appropriate action to protect Matthews and his interest in the plaintiff companies.

## TENTH CAUSE OF ACTION

## UNJUST ENRICHMENT

127)

The allegations above are repeated herein as if they were expressly set forth. Defendant JLTAC has been unjustly enriched through the illegal actions of the defendants herein. JLTAC is liable therefore to make restitution to plaintiffs herein in the absence of any proof of wrongdoing on JLTAC's part.

## ELEVENTH CAUSE OF ACTION

## UNJUST ENRICHMENT THROUGH WRONGDOING

128)

The allegations above are repeated herein as if they were expressly set forth. Defendant

Sullivan, Defendant Stolier, Defendant Sullivan and Stolier, Defendant Sullivan Stolier and Knight,

Defendants Connie Morgan, James Morgan, and Red River Management have been unjustly

enriched through wrongdoing, namely the illegal actions of the defendants herein as described in the

paragraphs above. Said Defendants are obligated to make compensation in addition to providing

restitution. In addition to Sullivan and Stolier's receipt of membership interest in JLTAC, and

ownership of Matthews' hospital company the Defendants have also received the following illicit

funds which constitutes unjust enrichment based on wrongdoing:

The LSH Income Statement for 10/1/2012 to 10/31/2012 shows as follows: The CMS
Adjustment was 355,578.25. This can be applied for at the end of 2013 cost report and
on information and belief approximately 80 percent will be collected. The Statement
also shows that for the month of October 2012, the total Income was 492,607.77. The
total adjustments are 367,447.90. The total net profit/gross profit was 125,160.68.
**Sullivan took 84,779.46 dollars as Legal Administration fees.** (In comparison the
hospital Medical Director received 4,500 dollars).

The  LSH Income Statement for 11/1/2012 through November 30, 2012 shows as
follows: Total income was 1404,260.60. The Medicare Adjustment (to be applied for at
the end of the following year for an anticipated 80 percent reimbursement) was
**768,076.02.** The Net income was 555,397.31. The Gross Profit was 555,397.31.
**Pursuant to the "Service Management Agreement "the manager, Morgan was paid
20,000 dollars categorized as "Service/Management Agreement ADM.  Sullivan
took 53,056.84 and labeled it "Legal Administration" fees**. (In comparison the
hospital Medical Director received 12,000 dollars).

LSH Income Statement for 11/01/2012 to 11/30/2012 (Statement printed 4/3/2013 at
2:09 pomp). It shows that for the month of November the total Income was 1,
404,260.60. The Net income was 555,397.31. The Gross Profit was 555,397.31.
**Pursuant to the "Service Management Agreement "the manager, Morgan was paid
20,000 dollars categorized as "Service/Management Agreement ADM. Sullivan took
$53,056.84 which represented payment of his legal bill to close the Kendrick deal.
He labeled it "Legal Administration" fees**. (In comparison the hospital Medical
Director received 12,000 dollars).

 LSH Income Statement for 12/02/2012 to 12/31/2012 (Statement printed 4/3/2013 at
2:29 p.m.). It shows that in December 2012 LSH received, 1 469, 385.80 in Income with
a Net Income of 916,353.00 and Gross Profit of 916,353.00.  **In December Morgan got
20,000 dollars from LSH under Service Management Agreement.  Sullivan took
"Professional Fees for Legal Administration" of $65,665.63 dollars**. In comparison,
the Medial Director Administrator receives $20,100).

LSH Income Statement for 1/1/2013 to 1/31/2013 (Statement printed 4/3/2013 at 2:51
pm) **Total Income was 2,318,933.59.** Net Income was 753,215.22. Gross Profit was
753,215.22.  **Defendant Morgan received 20,000 that month.  Sullivan took
$47,948.37.** (In comparison the Medical Director received $15,050.00.).

LSH Income Statement for 2/1/2013 to 2/28/2013 (Statement printed 4/3/2013 at 2:51

pm). Total Income was 2,311,750.95. Net Income was 775,947.62. Gross Profit was 775,947.62.  Morgan took 20,000 dollars. **Sullivan took $30,718.60 in "Legal Administration" fees that month.**

In so far as the LSH income statements for months following February 2012 will through discovery demonstrate similar payments, the Defendants are liable for unjust enrichment under Louisiana law in connection with said payments as well.

## TWELFTH  CAUSE OF ACTION

## CIVIL CONVERSION

### 129)

The allegations above are repeated herein as if they were expressly set forth.

Defendants Sullivan, Stolier, Sullivan and Stolier, Morgan have additionally committed conversion as set forth in the Civil Code through the proof of fault under CC Art. 2315 and the usurpation of the benefits and control Matthews legal rights' to his property, and his own hospital and membership interests in said hospital company.

## VIOLATIONS OF LOUISIANA BLUE SKY LAWS AND STATE REGULATIONS GOVERNING THE HEALTH CARE INDUSTRY

### 130)

The allegations above are repeated herein as if they were expressly set forth.

The Defendants globally are liable for violations of the Louisiana Securities laws, the Louisiana Blue Sky Laws and State Regulations Governing the Health Care Industry.

La. Rev. Stat. Ann. § 712.D. states that it shall be unlawful: for any person in connection with the offer, sale or purchase of any **security,** directly or indirectly: (1) To employ any device, scheme or artifice to defraud; or (2) To engage in any transaction, act, practice, or course of business which operates or would operate as a **fraud** or deceit upon the purchaser or seller.

La. Rev. Stat. Ann. § 51:702(13) provides that sale or sell means and shall include every contract of sale or disposition of a **security** or interest in a **security** for value. The term offer to sell, offer for sale, or offer shall include every attempt or offer to dispose of or solicitation of an offer to buy a **security** or interest in a **security** for value.

## THIRTEENTH  CAUSE OF ACTION

46

VIOLATIONS OF FEDERAL LAWS AND REGULATIONS GOVERNING THE

HEALTH CARE INDUSTRY

131)

The allegations above are repeated herein as if they were expressly set forth. Defendants Sullivan, Sullivan and Stolier, Sullivan Stolier and Knight aided and abetted by James Morgan, Connie Morgan and Red River are liable for recovery to plaintiffs under 15 U.S.C.S. § 78t(a), for violation of securities laws, including specifically 15 U.S.C.S. § 78j(b) and Rule 10b-5, 17 C.F.R. § 240.10b-5. Defendants unlawfully sold a security (the promissory note) to the detriment of the owner of the promissory note. 15 U.S.C. § 78c(a)(10) (1970). Defendants sold Matthews a security interest that was labeled a promissory note but operated like a bond. The face value of the bond was 1,200,000 dollars but it was to be paid as a percentage of receipts received by the hospital, thus the actual present value of the bond would depend on the revenues and earnings and the length of time it would take to pay the 1.2 million. The time could be anywhere from one year to ten years. Therefore the true investment rate of return was unknown. The payments are not fixed, nor based on a fixed rate of interest. The note is therefore acquired for investment. Further the note was exchanged directly for ownership of the share that Plaintiff held in WJLT,LLC which owned LSH.

Specifically, in the November 30 Power of Attorney, Defendants required the following condition precedent of the company JLTAC that he manages, and with Steve Stolier, controls:

j. JLTAC will issue to LSH a *promissory note* pursuant to which JLTAC shall promise to pay 1,200,000 dollars to LSH as follows: (a) in year one, 105% of all MCR receipts within 3 days of receipt, (b) in year two and following, 2.25% of all MCR receipts within 3 days of receipt, (c) in no event shall monthly payments be less than 10,000 dollars and (d) on March 1, 25% of EBITDDAM (Earnings Before Interest Taxes Depreciation Amortization and Management Fees) for the immediately preceding calendar year in excess of 1,500,000.

k. That LSH shall issue to WJLT a promissory note pursuant to which LSH shall promise to pay 1,200,000 to WJLT as LSH receives payments from JLTAC on the 1,200,000   note made by JLTAC in favor of LSH.

Further the Condition Precedent to the Power of Attorney stated :

That JLTAC will grant a "security interest" in favor of Matthews in its provider agreement and license to secure the 1,200,000 note made by JLTAC in favor of LSH.
1.

A pledge of **securities** can also constitute a sale of **securities** for purposes of the **Securities**

47

Exchange Act of 1934. The Power of Attorney purports to permit the Attorney to sell Plaintiff's Matthews share in Lazarus and WJLT, LLC to any company or person in exchange for a pledge of the hospital license.

## FOURTEENTH CAUSE OF ACTION

## VIOLATIONS OF FEDERAL LAWS AND REGULATIONS

## GOVERNING THE HEALTH CARE INDUSTRY

### 132)

The allegations above are repeated herein as if they were expressly set forth. In the ordinary course of the LTAC business, the owners are subject regularly to inquiries, investigations and audits by federal and state agencies that oversee applicable healthcare program participation and payment regulations, including enhanced medical necessity review of LTAC hospital cases pursuant to the SCHIP Extension Act and audits under the CMS Recovery Audit Contractor ("RAC") program which was made permanent and required to be expanded pursuant to the Tax Relief and Health Care Act of 2006. Federal and state governments impose intensive enforcement policies resulting in a significant number of inspections, citations of regulatory deficiencies and other regulatory sanctions including demands for refund of overpayments, terminations from the Medicare and Medicaid programs, bars on Medicare and Medicaid payments for new admissions and civil monetary penalties.

The Balanced Budget Act of 1997 (the "Balanced Budget Act") also includes a number of anti-fraud and abuse provisions. The Balanced Budget Act also provides a minimum ten-year period for exclusion from participation in federal healthcare programs for persons or entities convicted of a prior healthcare offense.

The funds health care organizations receive for participating in Medicare program constitute benefits within the meaning of the federal bribery statute within the meaning of 18 U.S.C.S. § 666(b) because those providers have derive significant advantages through satisfaction of the Medicare participation standards imposed by the government. The federal bribery statute (18 USCS 666) (1) prohibits various offenses, including **fraud,** against or involving parties defined in 18 USCS 666(b)

48

as organizations, governments, or agencies which receive, in any 1-year period, more than 10,000 in benefits under a federal program involving a grant, contract subsidy, loan, guarantee, insurance, or other federal assistance. **Medicare** is a federal assistance program. Sec. 666(b) reveals Congress' expansive and unambiguous intent to insure the integrity of organizations participating in federal assistance programs. Even if 18 USCS 666(c)--which removes from the statutory coverage any "bona fide" compensation or reimbursement in the usual course of business--relates to the statutory definition of benefits, **Medicare** payments to health care **providers** are not only for the limited purpose of compensation or reimbursement, but also for the additional purpose, which is in the interest of both a **provider** and the greater community, of assisting the **provider** in making available and maintaining a certain level and quality of care. Thus such a **provider** is receiving a benefit in the conventional sense of the term. The Federal Government has a legitimate and significant interest in prohibiting financial **fraud** or **acts** of bribery perpetrated upon **Medicare providers,** for such **acts** threaten the program's integrity and the ability of participating organizations to provide the expected level of care.

With respect to the **Medicare** program under 42 USCS 1395 et seq. and implementing federal regulations, the **Medicare** payment system--in which disbursements normally occur on a periodic basis and often in advance of a health care **provider's** rendering services--serves to protect the liquidity of **providers,** thereby assisting in the ongoing provision of services.

The federal False Claims Act (FCA), prohibits the knowing (i) submission of a false claim for payment to the federal government, (ii) creating or using a false record to get a false claim paid by the federal government, or (iii) conspiring to defraud the federal government by getting false claims paid. The FCA imposes liability where regulatory noncompliance or a false statement results in a fraud on the federal government. If found liable under the FCA, the court will impose on the defendant a penalty of three times the amount of the false claims, plus an additional penalty of between $5,500 and $11,000 per false claim.

Plaintiffs allege that Defendants are in violation of the provisions of the above federal Acts.

JURY TRIAL DEMANDED

133)
49

Plaintiffs are entitled to and demand a trial by jury.

## DAMAGES

### 134)
Plaintiffs allege the following damages resulting from the tortious conduct of Defendants

**Legal Fees:**

Sullivan billed Matthews (as owner of  CSH) for his legal services in connection with the lease between CSH and West Jeff and the move of the LTAC to West Jefferson.

Sullivan billed Matthews (as owner of  WJLT) dollars for the formation of WJLT and  the acquisition of Kindred's LTAC at West Jeff on Octoober 18, 2012.

Sullivan would have been fully and completely paid for his services through those bills.

**Loss of the Company as of November 30, 2012 :**

When WJLT was formed and before Sullivan insisted on his 4.9 percent membership and on Cressy being given 4 percent, Matthews owned 100 percent of WJLT.  Jimmy Morgan prepared a Pro Forma on October 11, 2012 for purposes of valuing the LTAC  after it was to be moved to West Jefferson and prior to obtaining LSH with it's grandfathered in provisions that make it so valuable. The Red River proforma gives an EBITDA (excluding the management fee) of $3,160,883 and thus a company value of $18,965,298.

The actual statements for the first start up months of  LSH received in April give an EBITDA (excluding management and legal fees) of $263,384 for the first four complete months (Nov-12 through Feb-12), giving an annualized value for EBITDA of $790,152 and thus a firm value of $4,740,914 dollars.

Sullivan's own valuation on October 18, 2012 of 4.99% of the company at $250,000 gives a firm value of the company at that time of $5,010,020. At the time the company was formed, therefore Sullivans valuation is consistent with the start up months.

Therefore during the start up months, through April if one were to accept defendants' own valuatios, Matthews company was valued at a  minimum of approximately 5,010.020 which is SUllivan's own valuation, or alternatively 18, 965, 298 which is defendannt James Morgan/Red River's valuation.

Matthews is entitled to recover his ownership interest in the company based at the very least on Defendants' own valuation.

**Future Losses:**

The Plaintiff is entitled to damages for future losses including the value of the company after it was taken from him on December 6, 2012 by the illegal use of the power of attorney and transferred to Sullivan and his partners.

WHEREFORE, Plaintiffs pray for a trial by jury and after all due proceedings had and all legal delays, they be awarded damages, arising out of the tortious conduct of Defendants

Respectfully Submitted,

BY: /s/ Marie Riccio Wisner

MARIE RICCIO WISNER (#11214)

50

700 CAMP STREET
NEW ORLEANS, LOUISIANA 70130
TELEPHONE (504) 528-9500 EXT 239
FACSIMILE (206) 457-1945
EMAIL: marie@mriccio.com
Counsel for Plaintiffs

CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS

STATE OF LOUISIANA

NO. _____                                        DIV. "__"

CHARLES MATTHEWS, individually; CHARLES MATTHEWS on behalf of his membership,
ownership or equity interest in the following: WJLT, L.L.C., Camillus Specialty Hospital,
L.L.C., f/d/b/a Crescent City Hospital;  Lazarus Healthcare, L.L.C.; Louisiana Specialty
Hospital, L.L.C. f/d/b/a Jefferson Extended Care; New Orleans Rehabilitation Hospital in Luling
and his wife SHERITA MATTHEWS

VERSUS

JACK STOLIER, STEPHEN M. SULLIVAN; SULLIVAN STOLIER, A PARTNERSHIP;
SULLIVAN STOLIER AND RESOR, A PROF LAW. CORP, SULLIVAN STOLIER
KNIGHT, L.C.; d/b/a THE HEALTH LAW CENTER; MICHAEL SCHULZE, RED RIVER
HEALTHCARE MANAGEMENT COMPANY, L.L.C.; JAMES MORGAN, CONNIE
MORGAN;  JEFFERSON LTAC, L.L.C. ("JLTAC");  CNA INSURANCE COMPANY; XYZ
INSURANCE COMPANY

FILED: _____          _____
                                                                   DEPUTY CLERK

VERIFICATION

        I, Charles Matthews, verify that the allegations contained in this Petition are true and
correct to the best of my information, knowledge and belief.

                                          _____
                                          CHARLES MATTHEWS
                                          OCTOBER 17, 2013